THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIZABETH DWORZANSKI *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 1—89—1532, 1—89—1611 cons.

Opinion filed September 24, 1991.—Rehearing denied October 16, 1991.

Jeffrey Dean Lewis, of Chicago, for appellant Scott Cihlar.

Julius Lucius Echeles, of Chicago, for appellant Elizabeth Dworzanski.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Maureen P. Kelly, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Elizabeth Dworzanski (Elizabeth) appeals after a bench trial from her convictions on one count of abducting her minor child, Paul (violating court order granting sole custody, care or possession to another), and an additional count of abducting Paul (violating court order prohibiting the concealment or detainment of a child). Claiming that she was improperly convicted twice for the same offense, that there was insufficient evidence to support her convictions and that she was denied a fair trial because of the exclusion of exculpatory evidence and because the trial court prejudged her case, she seeks a reversal of her convictions, a remand for a new trial, or a remand for resentencing if only one of her convictions is reversed.

Scott Cihlar appeals, after being jointly tried with Elizabeth and with Jolanta Kawecka, who is not a party to this appeal, from his conviction for aiding and abetting in the child abduction of Paul (in the planning or commission). He argues that his indictment failed to properly charge him with an offense, that there was insufficient evidence to support his conviction, and that by using evidence against him which was presented by the codefendants in their defense, but which he did not adopt in his own, and by holding him to a higher standard of conduct than that by which he was required to abide, the circuit court denied him a fair trial. Cihlar seeks reversal of his conviction or a reversal with a remand for a new trial.

Mitch Dworzanski (Mitch) testified at trial that he was Elizabeth's husband at the time of the incident in question, but that divorce proceedings were pending between the couple. The Dworzanskis had two children, Thomas, age three, and Paul, age two. The court hearing the Dworzanskis' divorce case entered an order on April 15, 1988, granting Mitch possession of Paul and Thomas from that date until April 19, 1988.

Mitch, Paul and Thomas left the home of one of Mitch's friends on the evening of April 16, 1988, and while walking in an alley on the way to Mitch's car, they were confronted by Elizabeth, Cihlar and Kawecka. Elizabeth began to curse at and to strike Mitch. Kawecka pulled Thomas away from him, and while Cihlar pushed Mitch several times, Elizabeth pulled Paul away. After falling to the ground, Mitch

arose and followed the three adults as they took Paul and Thomas into another alley. Mitch witnessed their entering a car and driving away with an unidentified man at the wheel.

Mitch was reunited with Thomas later that night at the police station where the boy had been taken. Mitch and a police officer later searched Elizabeth's residence for Paul, but they failed to find him there.

Mitch testified on cross-examination that he was uninjured by the fracas in the alley, but then admitted signing and filing "papers" on April 19, 1988, with the court hearing the divorce proceedings. These "papers" stated that he had been attacked by Elizabeth, "her boyfriend" Cihlar, and Kawecka; and that Elizabeth had jumped on his back and pulled his hair, while Cihlar "pummeled [him] *** about the head and face causing contusions, bruises, and bleeding."

One Masonick, whose first name is not supplied by the record, testified that he was a youth officer for the Chicago police department at the time of the incident. He saw Elizabeth, Cihlar, Kawecka and Thomas at the police station on the evening of April 16, 1988, but they were not then in custody. Later, at about 9:30 or 10 p.m., Mitch arrived at the station, accompanied by his attorney. Masonick spoke with Mitch, who related the details of the incident, which he said took place at around 8:30 p.m. Masonick did not think that Mitch was under the influence of alcohol, and he noticed that Mitch's pants had smudge marks on the knees. At approximately 10:30 p.m., Masonick received a copy of the court order granting Mitch temporary possession of Thomas and Paul; accordingly, Thomas was then turned over to Mitch's custody.

Masonick sent police officers to Elizabeth's residence in order to look for Paul, but they were unsuccessful. When, at the police station, Masonick asked Elizabeth about Paul's whereabouts, she said that "she did not know his whereabouts." Cihlar told Masonick that he was "an Illinois Department of Children and Family Service[s] [DCFS] worker, and that he [had] been assigned to investigate this case in the past as a child abuse worker." Cihlar also related that he had contacted Elizabeth earlier in the evening, that she seemed distraught and that he wanted to go to her house "to comfort her." According to Masonick, Cihlar admitted that "he was aware that there was a court order *** giving custody of the father [sic]—Mitch *** of the children from the 15th of April to the 19th of April"; however, he accompanied Elizabeth to Mitch's friend's house in order to locate him and the children. When they observed the children in Mitch's company, the boys ran from Mitch to Elizabeth. The adults then took the

children (apparently, however, only Thomas) to the police station. Cihlar told Masonick that they thought Mitch was intoxicated, and that they brought Thomas to the police station to report child abuse. Masonick did not observe any signs of physical abuse to Thomas. When he asked Cihlar about Paul's whereabouts, Cihlar replied that "he didn't know where the boy was."

On cross-examination, Masonick testified that he didn't receive a copy of the court order granting Mitch possession of the boys until after he spoke with Cihlar. In addition, he never asked Cihlar for a written statement, or indicated on his report either whether Mitch was intoxicated at the time he was interviewed or that he had smudge marks on his pants.

Sylvia Duignan testified that she was driving near the scene of the alleged abduction at about 8:30 p.m. on April 16, 1988. She saw Mitch alone in an alley, saw him get up from the ground, stumble across the alley, bend over a fence, vomit and reach out toward a nearby garbage can.

Kawecka testified that Elizabeth came to her apartment at about 8 p.m. on April 16, 1988, and asked her to accompany her to where she believed Thomas and Paul were. Cihlar, Elizabeth and she arrived by car at the scene within a half hour. They left the car and saw Mitch leave a building with Thomas and Paul. Mitch was swaying as he walked, and the children were walking about a foot behind him. When the boys saw Elizabeth, they began to run toward her; Thomas went to Elizabeth, but Mitch had Paul by the hand. Thomas then began to run from Elizabeth, but Kawecka stopped him before he ran into another alley.

Kawecka did not see Mitch get hit, nor did she pull any of the children away from him. She and Thomas went back to the car, and about two minutes later, Elizabeth and Cihlar arrived with Paul. They drove to Elizabeth's brother's house to drop Paul off, and then went to the police station with Thomas, where they were later arrested. At the police station, Kawecka noticed that Thomas had a rash on his lower body, but saw no other injuries; he also appeared to be dirty.

Elizabeth admitted at trial that she saw a copy of the court order when the police arrived at her home to enforce it by delivering the boys to Mitch's possession. On the evening of April 16, 1988, Cihlar called her and she asked him to come over to her house. She intended to look with Cihlar and Kawecka for her children, to "see what [was] *** going on." She next saw the children just after 8 p.m. that evening, walking behind their father who, according to her testimony, "was drunk." Thomas was holding Paul by the hand, and when

Thomas saw Elizabeth, he yelled and began to run toward her. Mitch caught Paul and kept him from running away. Elizabeth embraced Thomas, who then started to run from her; Kawecka stopped him. Paul tore himself away from Mitch and ran toward her. She took Paul back to the car, where Kawecka and Thomas had gone. They then drove to her brother's house, where Elizabeth's aunt lived, and dropped off Paul, who by this time had fallen asleep. She told her aunt that she was going to the police station and would soon return to take Paul to the hospital. They then went to the police station with Thomas. Once at the station, she telephoned her home and learned that Paul had been taken there.

Elizabeth stated that neither she, Cihlar nor Kawecka struck Mitch, whom she described as "tossing and turning," smelling of alcohol and "dirty." By the time she saw Mitch at the station, at around midnight, he had shaven and had changed his clothes.

According to Elizabeth, when Masonick asked her about Paul's whereabouts, she told him that the boy was at her home. She stated that she did not intend to conceal Thomas and Paul either from Mitch or from the police. Further, she took her children away from their father only after they ran to her. She admitted, however, that she failed to comply with her duty to bring Paul and Thomas with her to the divorce hearing on April 15, 1988, when the order was issued granting Mitch temporary possession. She claimed that the court order failed to reflect the requirement that Mitch was not to be drunk while visiting with the children. She understood, however, that he was to have possession of them until April 19, 1988.

After convicting Cihlar and Dworzanski, acquitting them of several other related charges, and acquitting Kawecka of all charges, the trial court sentenced Cihlar and Dworzanski each to two years' probation.

■■ Elizabeth first claims that her conviction for the abduction of Paul (violating court order prohibiting the concealment or detainment of a child) should be vacated because that conviction arose from the same physical act as her conviction for child abduction (violating court order granting sole custody, care or possession to another) and because there was no court order which prohibited her from concealing or detaining Paul. The State responds that she "was not convicted of both counts because only one sentence was imposed" and that the court order which granted Mitch temporary possession of Paul "clearly but implicitly" prohibited her "from concealing or detaining" Paul.

Elizabeth was convicted of violating sections 10—5(b)(1) and (b)(2) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1987, ch. 38, pars. 10—5(b)(1), (b)(2)), which read:

"(b) A person commits child abduction when *** she:

(1) Intentionally violates any terms of a valid court order granting *** possession to another, by concealing or detaining the child ***; or

(2) Intentionally violates a court order prohibiting the person from concealing or detaining the child ***."

While Elizabeth concedes that she was bound by an April 15, 1988, circuit court order which gave Mitch temporary possession of Paul, as required for a conviction under section 10—5(b)(1), there was no court order which "prohibit[ed her] from concealing or detaining [Paul]."

The court, although the State argues otherwise, found Elizabeth guilty of violating both sections 10—5(b)(1) and (b)(2). Since section 10—5(b) distinguishes between two types of court orders, we find no support for the State's proposition that the order granting "possession of his two minor children," which clearly fell within section 10—5(b)(1), implied that Elizabeth could not "conceal[ ] or detain[ ] the child" so as to also fall within section 10—5(b)(2). Accordingly, because there was no court order which "prohibit[ed Elizabeth] *** from concealing or detaining" Paul, Elizabeth's conviction for violating section 10—5(b)(2) of the Code is reversed.

Next, Elizabeth avers that the State failed to prove beyond a reasonable doubt that she intentionally violated the court order on which her remaining conviction was based. She contends that she intended only to remove Paul from a situation which she reasonably believed was harmful to him, namely, the possession of his intoxicated father; thus, her actions were intended to prevent a greater harm than that resulting from her violation of the order. As evidence of her lack of criminal intent, she points out that she took Thomas and Paul from Mitch while she was in the company of DCFS worker Cihlar, that she took Thomas to the police station almost immediately and that she told the police where they could find Paul, whom she had not taken to the police station only because he was asleep.

The State responds that Elizabeth's asserted belief that she was protecting Paul from the possession of his intoxicated father was only relevant as part of a "necessity" defense. Accordingly, it argues, because there was sufficient evidence for the trial judge to find that Elizabeth did not reasonably believe that her acts were necessary to avoid harm to Paul, and to find that she withheld information about Paul's whereabouts from the police when she brought Thomas to the

police station, the court did not err in failing to acquit her on the basis of necessity.

The State correctly maintains that even if the trial judge had found that Elizabeth believed that Mitch was drunk, such a finding would not have been inconsistent with its finding that she intentionally violated the court order. The State is also correct in its contention that Elizabeth's asserted belief is only relevant insofar as it raises the defense of "necessity," requiring her to show that she "reasonably believed such conduct was necessary to avoid a[n] *** injury greater than the injury which might reasonably result from [her] own conduct." (Ill. Rev. Stat. 1987, ch. 38, par. 7—13.) As to affirmative defenses (Ill. Rev. Stat. 1987, ch. 38, par. 7—14), "the defendant, to raise the issue, must present some evidence thereon. *** If the issue *** is raised then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." Ill. Rev. Stat. 1987, ch. 38, par. 3—2.

■ The necessity defense "justif[ies] only such otherwise illegal conduct which constitutes the sole reasonable alternative available to the act or in the circumstances." (*People v. Perez* (1981), 97 Ill. App. 3d 278, 281.) In the instant case, we cannot say that the court erred in declining to give weight to Elizabeth's necessity defense. Even if Elizabeth reasonably believed that Mitch was intoxicated, she failed to present any evidence that Paul was in danger as a result of his father's condition. Moreover, because the trial court was entitled to find that Elizabeth "concealed" Paul by telling Officer Masonick that she did not know where he was, a finding which was supported by evidence that Paul was not at Elizabeth's house as she claimed at trial, it could reasonably have found that the State had overcome her necessity defense by proving that she had acted beyond the scope of what was reasonably necessary to protect Paul. Accordingly, the finding was not contrary to the evidence.

■ Next, Elizabeth argues that the trial court improperly excluded evidence of Mitch's intoxication, which was relevant to her defense that she did not intend to violate the court order in question; therefore, she was denied a fair trial. We note, however, that she failed to raise this issue in her post-trial motion for a new trial; but, as noted above, even if the trial court had believed that Mitch was intoxicated, we do not apprehend how the judgment of the court could have been any different. Accordingly, we hold that review of this issue has been waived. *People v. Young* (1989), 128 Ill. 2d 1, 47.

Elizabeth then claims that the trial judge prejudged her case, as evidenced by his statement at trial that he would not consider evidence that Mitch was intoxicated and by, on five occasions, interrupting defense questioning or excluding evidence the State had not even requested be excluded. Essentially, the trial judge is accused of having acted as an advocate for the State. The State responds that the trial judge did not show prejudgment by failing to consider evidence of Mitch's intoxication and acted properly in his statements during the trial, seeking only to clarify and expedite nonresponsive and repetitive testimony.

In *People v. Griffin* (1990), 194 Ill. App. 3d 286, 296, the court held, "A trial court is free to examine witnesses in its discretion, provided it does not become an advocate, abandoning its function as an impartial tribunal." Moreover, "the danger of prejudice due to judicial questioning decreases sharply in cases tried without a jury. [Citations.] The relevant inquiry in a non-jury trial is whether the tenor of the court's questioning indicates that the court has prejudged the verdict before hearing all of the evidence." 194 Ill. App. 3d at 296.

Elizabeth compares the actions of the trial judge in the instant case with that of the trial judge in *People v. Diaz* (1971), 1 Ill. App. 3d 988. In *Diaz*, the judge, in a bench trial, was held to have prejudged the case when he thrice stated his belief, before he had heard all of the defense's evidence, that the defendant was guilty. This court, on appeal, held that it was insignificant "that the trial judge was willing to reserve his ruling, a willingness he expressed each time the premature action was called to his attention." (1 Ill. App. 3d at 992.) This court further held that the trial court's pronouncements, despite "the discretionary power *** to control, within reasonable limits, how the right [to argue a cause in a criminal case] shall be enjoyed," effectively denied the defendant the right to argue his case. 1 Ill. App. 3d at 992-93.

■ After carefully reviewing the incidents Elizabeth complains of in the instant case, we hold that the trial court neither prejudged her case nor abused its discretion. None of them had the effect of denying her right to argue her case; none indicated a predisposition to convict. The court, as noted above, properly disregarded evidence of Mitch's intoxication. Further, the statements made during this trial were akin to those in *Griffin*, in which a trial judge sitting without a jury asked the defendant questions which had the effect of diminishing the defendant's credibility, and to those in *People v. Concil* (1967), 80 Ill. App. 2d 72, 77, in which the judge questioned witnesses in order "to

clarify the evidence to establish preliminary matters in his own mind.''

During Elizabeth's trial, the judge occasionally participated in order to clarify matters and to keep counsel from venturing into areas which were properly not relevant to the case. Moreover, while he interjected more frequently during Elizabeth's interrogation than in that of any other witness, her testimony tended to be the most unresponsive and the most difficult to follow, perhaps because of language difficulties (an interpreter was used throughout her testimony), or because she seemed particularly eager to get her version of events before the court in her own fashion. Accordingly, we hold that the judge did not abuse his discretion in his conduct of the trial.

▆ Having determined that Elizabeth's conviction for violating section 10—5(b)(2) of the Code should be reversed, the issue arises as to whether her cause should be remanded for resentencing. As noted earlier, although the State contends that Elizabeth was convicted of only one crime and received only one sentence, the trial judge made it clear in rendering his verdict that he was convicting her of two counts of child abduction. It is unclear from the record whether her sentence of two years' probation was based on the trial judge's erroneous belief that she had been convicted of two crimes; we hold, therefore, that her cause should be remanded for resentencing. See *People v. Lopez* (1986), 147 Ill. App. 3d 127, 128 (remandment for resentencing required when a single sentence is given for convictions on multiple counts, one or more convictions of which are vacated, and when the sentence may have been affected by the existence of the vacated convictions(s)).

Accordingly, Elizabeth's conviction is affirmed in part, vacated in part and remanded only for resentencing.

Cihlar, in his appeal, first argues that the trial court erroneously denied his "Motion in Arrest of Judgment," claiming that the indictment on which he was convicted did not properly charge an offense in that it failed to properly identify the court order he was accused of violating, failed to properly describe the acts which constituted aiding and abetting child abduction, failed to specify the time and place of the offense and failed to allege the nature and elements of the offense. The State responds that when all the counts on which Cihlar was charged are considered, the record shows that he was properly charged with aiding and abetting child abduction (in the planning or commission). The count on which Cihlar was convicted reads:

"[O]n or about April 16, 1988 at and within the County of Cook SCOTT CHILAR [*sic*] *** committed the offense of AIDING

AND ABETTING CHILD ABDUCTION in that [he] BEFORE AND DURING THE COMMISSION OF THE OFFENSE OF CHILD ABDUCTION, AND WITH THE INTENT TO PROMOTE AND FACILITATE ELIZABETH DWORZANSKI IN THE PLANNING AND COMMISSION OF SUCH OFFENSE, AIDED AND ABETTED HER IN THE VIOLATION OF AN ORDER OF A JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS IN CONCEALING AND DETAINING PAUL DWORZANSKI AGED 2, IN VIOLATION OF CHAPTER 38, SECTION 10—7(I) OF THE ILLINOIS REVISED STATUTES 1985 AS AMENDED ***."

Cihlar cites section 111—3(a)(3) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 111—3(a)(3)), claiming that his indictment failed to "[s]et[ ] forth the nature and elements of the offense charged." In *People v. Fox* (1983), 117 Ill. App. 3d 1084, 1085, the court held that an indictment charging a defendant under section 31—1 of the Code (Ill. Rev. Stat. 1981, ch. 38, par. 31—1) with obstructing a police officer was not sufficient when it charged him with obstructing the officer "by attempting to conceal the whereabouts of Joe L. Pate." (Emphasis omitted.) Although more specific than the statute, the indictment was held to have failed to "sufficiently describe the act or acts which form[ed] the basis of this charge so as to afford the defendant the full protection against double jeopardy contemplated by the constitution." 117 Ill. App. 3d 1086.

Cihlar also cites *People v. Griffin* (1967), 36 Ill. 2d 430, in support of his argument. *Griffin* held that because the term "recklessness" describes both legal and illegal acts, indictments for reckless driving must allege the specific reckless acts at issue in order to protect the defendant from double jeopardy. (*Griffin*, 36 Ill. 2d at 434-35.) In *People v. Hayes* (1979), 75 Ill. App. 3d 822, 824, the court held:

"[A] charging document which adopts the language of the statute is sufficient if the words of the statute particularize the offense so that an accused is apprised with reasonable certainty of the precise offense with which he is charged. The determination of whether these standards have been met is accomplished by reference to the plain and ordinary meaning of the words of the charging instrument as read and interpreted by a reasonable person."

The court in *Hayes*, as did the court in *Griffin*, held that indictments for reckless conduct must allege the acts with greater specificity than "performed recklessly certain acts."

■ In *People v. Wisslead* (1985), 108 Ill. 2d 389, 393, however, the court upheld the sufficiency of an indictment which paralleled the language of section 10—3(a) of the Code (Ill. Rev. Stat. 1983, ch. 38, par. 10—3(a)) in charging that the defendant committed unlawful restraint when he " 'knowingly without legal authority, detained Nancy Rutledge Wisslead.' " (108 Ill. 2d at 393.) The court held:

> "The language of the statute can serve to apprise the defendant of *both* the nature and the elements of the offense, so long as the statutory language specifies, with reasonable certainty, the type of conduct being alleged." (Emphasis in original.) (108 Ill. 2d at 394.)

Accordingly, and despite the holding in *Fox*, we believe that the charge of the indictment that Cihlar "AIDED AND ABETTED HER [Elizabeth] IN THE VIOLATION OF AN ORDER OF A JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS IN CONCEALING AND DETAINING PAUL" permissibly tracked the language of the applicable statutes, section 10—7(a)(i) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 10—7(a)(i)) and section 10—5(b)(1) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 10—5(b)(1)) so as to properly inform Cihlar of the acts of which he was accused. Nor do we foresee any likelihood that he could be subject to double jeopardy (U.S. Const., amend. V; Ill. Const. 1970, art. I, §10) by being charged with acts different from those which the State attempted to prove in the instant case, but which would still fall within the accusation of "concealing or detaining Paul."

With regard to Cihlar's allegation that the court order he was charged with violating was not specified in the indictment, the State points out that such a specification was contained in the count charging him with violating section 10—5(b)(1) of the Code when it identified the order as one which "GRANT[ED] *** SOLE CUSTODY, CARE AND POSSESSION OF PAUL DWORZANSKI, AGED 2, TO MITCH DWORZANSKI, ITS FATHER." "[E]lements missing from one count of a multiple-count indictment or information may be supplied by another count." (*People v. Hall* (1982), 96 Ill. 2d 315, 320.) Finally, Cihlar's claim that the indictment improperly failed to allege the time and place of the offense is groundless. The indictment alleged that his acts took place on April 16, 1988, and that they took place within the County of Cook; such elements comply with the requirements of section 111—3(a)(4) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 111—3(a)(4)) that an indictment "[s]tat[e] the date and county of the offense as definitely as can be done." See *People v. Blanchett* (1965), 33 Ill. 2d 527.

Next, Cihlar alleges that there was insufficient evidence to support his conviction and that therefore the trial court should have granted his motion for a "directed" finding of acquittal, or that at least it should have acquitted him at the close of the proceedings. Specifically, he maintains that he was not identified as the driver of the vehicle that carried Paul away, that he was not shown to have known of the court order he was alleged to have intentionally violated, and that his acts did not constitute aiding and abetting. The State responds that whether or not he was the driver of the car used to take the children, Mitch's testimony that Cihlar helped take the children from him was sufficient to show that he aided and abetted Elizabeth in removing Paul from Mitch's possession. Further, the State points to Masonick's testimony that Cihlar "stated that he was aware that there was a court order issued by Judge Bellows giving custody of [*sic*] the father—Mitch Dworzanski—of the children from the 15th of April to the 19th of April." This testimony, the State avers, was sufficient to show that Cihlar knew of the court order he was convicted of violating.

■ The facts in the instant case, viewed in the light most favorable to the State (*People v. Rey* (1985), 136 Ill. App. 3d 645, 650), fully support the trial court's determination. Masonick's testimony that Cihlar told him that he was "aware" of the court order granting Mitch possession allowed the court to infer that he knew of the order at the time of the abduction. Additionally:

" '[I]f the proof shows [the defendant] was present at the crime without disapproving or opposing it, the trier of fact may competently consider this conduct with other circumstances and thereby reach a conclusion that such person assented to the commission of the criminal act, lent his countenance and approval and was thereby aiding and abetting the crime.' " (*People v. Nugara* (1968), 39 Ill. 2d 482, 487, quoting *People v. Clark* (1963), 30 Ill. 2d 67, 72.)

Accordingly, Mitch's clear identification of Cihlar as one of those who met him in the alley and took Paul and Thomas away, Masonick's testimony that Cihlar admitted at the police station that he was aware of the court order, that he had helped seek out Mitch and that he did not know Paul's whereabouts, despite appearing at the police station with Elizabeth and with Thomas, properly allowed the court to find that Cihlar aided and abetted Elizabeth in committing child abduction.

Finally, Cihlar claims that he was denied a fair trial by the court's consideration of inculpatory evidence provided by his codefendants as part of their defense, but which he did not adopt as part of his own

defense, and in addition, by the court's consideration of his status as a DCFS employee in determining his guilt. Cihlar asserts that the trial judge, in determining his guilt, improperly considered evidence provided by Kawecka and Elizabeth that he drove the car in which he, his codefendants and the children left after the incident in the alley, that he knew about the court order which gave Mitch possession of Paul and that when he was interrogated by Masonick, he knew Paul's whereabouts. He further claims that the trial court impermissibly presumed that because Cihlar worked for DCFS, he knew that he was assisting Elizabeth in violating a court order, and that his failure at the police station to inform Masonick of Paul's whereabouts was in violation of his duty as "an officer of the court" to volunteer such information. The State responds that the trial judge considered only competent evidence in determining Cihlar's guilt and that Cihlar's status as a DCFS worker was not a factor in that determination.

In finding Cihlar guilty, the trial judge stated:

"As to Mr. Chilar [sic], here's a man who works for the D.C.F.S. He obviously has to know what he is doing when he himself said take the kids to the station, which was wrong at that point, but any way at least it's something. He did take one and he knew that the other kid—he knew where the other kid was cause he drove the kid there. He didn't tell the police where the child was either. Again, there may not be any exact testimony that anybody asked him that question, but he never volunteered it either, which as an officer of the court which he was working at supposedly he certainly should have, so I'm going to find him guilty of the aiding and abetting as to Paul."

During the hearing on Cihlar's motion for a new trial, after his counsel argued that the judge had wrongly used Elizabeth's and Kawecka's testimony in finding Cihlar guilty, the judge stated, "Let me put your mind at rest. I based it on the testimony of what took place in the alley." Later the judge stated:

"I found him guilty because when he came on the scene in the alley, the father was in custody of the child. When they left, they left with the child, and as an officer of court he should have known better than that. I don't think he should have ever left that alley with the child. It's that simple."

Cihlar then argued that there was no evidence that he was employed as a DCFS officer at the time of the incident; that instead, he was a former officer. The court stated:

"I don't know whether he was or wasn't. I know from the evidence I heard as applicable to Mr. Chilar [*sic*] was that he was at one time or even at that time was a DCFS officer.

    ***

And that he has a duty then certainly to enforce all court orders, so it's just that simple again."

Finally, in responding to Cihlar's argument that Masonick's testimony that he was aware of the court order didn't show that he knew about the order at the time of the alleged abduction, the court stated:

"[T]he fact when he learned of it was totally immaterial, totally immaterial, and whatever Masonick said or didn't say or whenever he learned the order is not the point at all. The point is he is going with a woman to get custody of her child, and he knows that the custody is in the husband.

    ***

The facts will indicate that he went with her because she went to get the custody of her child from this horrible creature, the husband who was having it, now, you might say that, well, weren't you presuming a little, Judge, in determining what they talked about when you come there, but when these people go to get the child or to find out the whereabouts or what the child is doing, you got to presume that the other guy has got the custody, especially if you are from the DCFS. It's [*sic*] just doesn't add up any other way, so please let's forget about Masonick cause it's not important at all.

MR. OBBISH [Cihlar's attorney]: Well, what I think is important, though, Judge, is that you are saying—you are presuming something, but there is no evidence of it. You are presuming he knew about the order when there is no evidence as to when he found out about the order.

THE COURT: No, forget about the order, because the order doesn't matter. I'm presuming that he knew that the husband had the custody."

"[W]hen the trial court is the trier of the facts every presumption will be accorded that the judge considered only admissible evidence and disregarded inadmissible evidence in reaching his conclusion." (*People v. Wallenberg* (1962), 24 Ill. 2d 350, 354.)

In *Wallenberg*, the court held that although the evidence was sufficient for conviction, the trial judge's statement that, based upon his knowledge about a particular street, he did not believe the defendant's story that there were no gas stations on a particular stretch of

that street overcame the presumption of propriety and denied the defendant due process of law. The court held that "the trial judge's statement, incorporated in the record, that he had considered matters which were not in evidence necessarily rebuts this presumption." *Wallenberg*, 24 Ill. 2d at 354.

■ In the instant case, although the trial judge stated during the hearing on Cihlar's post-trial motion that he considered only the testimony "of what took place in the alley," and while, as noted above, he could have convicted Cihlar on the competent evidence alone, the statements he made while delivering his judgment and during the post-trial hearing demonstrate most strongly that he took into consideration his own beliefs about what Cihlar should have known as an "officer of the court." For example, the judge stated that Cihlar's intent to violate the court order was proved by his knowledge, as a DCFS employee, that Mitch had custody of the child. The State was required to prove, however, not only that Cihlar intended to deprive Mitch of his possession of Paul, but also that in doing so he intended to violate the court order granting possession to Mitch. There was no evidence that Cihlar's status as a DCFS employee or as an ex-employee of that agency gave him any knowledge that Mitch's possession of Paul was pursuant to a court order. In fact, the trial judge stated at one point that "the order doesn't matter. I'm presuming that he knew that the husband had the custody." He further explained that Masonick's testimony that Cihlar was aware of the court order "is not the point at all. The point is he is going with a woman to get custody of her child, and he knows that the custody is in the husband."

Section 10—5(b)(1) of the Code, however, requires intent to violate a court order. Regardless of Cihlar's knowledge that Mitch had "custody" of Paul, it is elementary that he could not have intended to violate the court order unless he knew that it existed. The trial judge, however, presumed without any proof that merely because Cihlar was a DCFS employee, he knew that Mitch had custody, and dismissed the question about whether Cihlar knew about the court order. Indeed, the judge's references to Cihlar's status as a DCFS employee and his presumption that Cihlar was, as such, an officer of the court at one time or another, thus signifying that he knew of Mitch's custody, run throughout the judge's comments from the bench like a leitmotif. Therefore, because the judge pointedly ignored the language of the statute in finding Cihlar guilty, and instead based his finding of guilt upon evidence *de hors* the record, Cihlar's conviction is reversed; however, because there was competent evidence upon which he could

have been convicted, his cause is remanded for a new trial. *Wallenberg*, 24 Ill. 2d at 354.

Affirmed in part; reversed in part and remanded.

HARTMAN and DiVITO,* JJ., concur.

---

*Although Judge DiVito did not participate in the oral argument had in this case, he has read the briefs and has otherwise participated in the decision-making process.