THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DEBORAH GRIFFITH, Defendant-Appellant.

First District (1st Division)   No. 1—91—2936

Opinion filed May 10, 1993.

Rita A. Fry, Public Defender, of Chicago (Mark Floyd Pasterski, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Judith M. Pietrucha, Special Assistant State's Attorney, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Deborah Griffith was found guilty of abducting her daughter, Rebekah Ford, from the child's father, Bruce Ford. Defendant was sentenced to nonreporting probation and now appeals.

The record of the proceedings at trial indicates the following facts. The State's first witness was Deborah Ford, one of defendant's daughters. At the time of trial, Deborah was 18 years old and living with her father, Bruce Ford, brother Brian and sisters Diane and Rebekah. Deborah testified that her family lived in Hoffman Estates when she was a child and that defendant moved out of the house in 1980, when Deborah was nine years old. Subsequently, the children were awarded possession of the family home; defendant and the father spent alternating weeks in the house. Deborah's youngest sister, Rebekah, went on visitation with defendant every other weekend.

Deborah testified about an incident in 1980 where her father stopped defendant from taking Rebekah from the house. According to Deborah, defendant went to a window and yelled for help, accusing Bruce of beating .defendant. Deborah testified that this was not true because Bruce was not near defendant. Deborah also testified that defendant then went into the bathroom alone and emerged looking disheveled, with a torn blouse. Deborah stated that defendant bit Bruce's forearm during this incident.

Deborah testified that she never saw Bruce abuse either defendant or the children, though Bruce did discipline the children. Deborah stated that she did see defendant hit Bruce.

On Friday, December 16, 1981, Deborah saw defendant pick up Rebekah and leave for a weekend visitation. Neither defendant nor

Rebekah returned at the conclusion of the weekend. Deborah did not see Rebekah again until April 1989.

On cross-examination, Deborah testified that she had thought her parents were married. Deborah admitted that while she never saw Bruce slap defendant, she did see him push and grab defendant. They often fought verbally; defendant would accuse Bruce of seeing someone named Barbara. Deborah further testified that she had no contact with defendant after December 16, 1981. She admitted that defendant called her once at a friend's house, but that she hung up on defendant out of embarrassment. She admitted that she resented defendant for leaving.

Diane Ford, Deborah's twin sister, and Brian Ford, Deborah's 20-year-old brother, generally corroborated their sister's testimony regarding their parents' relationship.

FBI Agent Stanley Walker testified that he was assigned to the Department of San Francisco division in 1989 and 1990. He testified that he received a call on April 4, 1989, regarding a possible fugitive in the Eureka, California, area. After further investigation, he determined that the persons in question were defendant and Rebekah Ford.

Agent Walker went to Rebekah's school with a woman from Child Protection Services of Humboldt County and had Rebekah, who was then known as Heather Brown, brought to the principal's office. There, Agent Walker told Rebekah of her true identity. He then went to defendant's place of work to identify her for arrest. Agent Walker identified defendant in court.

The State moved to introduce court orders regarding custody of the Ford children. These orders were then published to the jury.

Rebekah Ford was 13 years old at the time of trial. She testified that her earliest memories are of living in San Antonio, Texas, when she was five or six years old. Shortly thereafter, she and defendant moved to Bedford, Texas. Defendant's boyfriend, Garold Davisson, later came to live with them in Bedford, where they stayed for four years. Rebekah testified that she visited her aunt in New Mexico every summer and saw her maternal grandparents during summers and holidays. She stated that she had been known as Heather Ann Brown and that defendant had been known as Mary Bank and Mary Carter.

Rebekah and defendant moved to California after Garold moved to Sacramento. Rebekah did not like living with Garold's relatives in Sacramento. Rebekah and defendant later moved to Eureka, where they lived with a roommate named Diane. Rebekah did not like this

roommate, whom Rebekah accused of hitting and kicking her. Rebekah stated that she was happy in Eureka, except for Garold's and Diane's presence.

Rebekah then testified about the day Agent Walker told her of her true identity. Rebekah was shocked; she cried. Rebekah testified that when she was eight years old, defendant had told her that her father had left and taken her brothers and sisters with him to parts unknown. Rebekah was taken to a foster home for the night and had breakfast with Bruce the following morning. She and Bruce then flew to Chicago, where she met the rest of her family in what Rebekah called a happy reunion, with everyone hugging and kissing.

On cross-examination, Rebekah admitted that she had visited with defendant since she resumed living with Bruce, but denied writing letters to defendant. The State rested.

Defendant called over a dozen witnesses, primarily former neighbors, friends and relatives, to testify regarding defendant's relationship with Bruce Ford and with her children. Two former neighbors, Dana Whitcomb and Mary Ducato, testified to incidents where Bruce physically abused defendant. Defendant's brother, David Griffith, testified that he spent the summers of 1978 and 1979 with defendant and Bruce. David testified that he saw Bruce physically assault defendant at least seven times during those summers. The other witnesses testified that they did not see Bruce hit defendant, though some saw defendant with various injuries and suspected defendant was being abused by Bruce.

Linda Ford testified that she was married to Bruce Ford from 1968 through 1970. She testified that during her pregnancy in 1968, Bruce became drunk and jumped on her stomach, causing her water to break and causing the child to be delivered earlier than expected. Linda also testified to two later incidents where Bruce hit and pushed her, causing her to file for divorce.

Linda also testified that she still has bitter feelings about Bruce. According to Linda, Bruce slept with defendant while he was still married to Linda. Linda testified that her feelings about Bruce also stem from her belief that Bruce is unsupportive of their son. Linda indicated that she was angry that Bruce spent so much money looking for Rebekah.

Defendant then testified in her own behalf. At the time of the trial defendant was 41 years old and living with friends in McHenry, Illinois. Defendant testified that she lived with Bruce Ford for 11 years. Bruce was married and had fathered a son when defendant met and began dating him. Defendant testified that she moved in with

Bruce, but moved out in January 1970 after discovering him with another woman. Defendant then discovered she was pregnant. Defendant testified that when she told Bruce of her pregnancy, Bruce punched her in the stomach and told her to get an abortion. Defendant testified that she was brought up a strict Catholic. However, between January and April 1970, the two talked; defendant agreed to return to Bruce in April 1970. Bruce agreed he would marry defendant, but convinced her to wait until after their child was born.

On August 1, 1970, Bruce's job required that he move to Colorado. Defendant went with Bruce, who told his employer that they were married. Defendant told her parents that she was married to Bruce. Defendant recalled an incident in July 1970 where Bruce punched her in the nose over a disagreement about whether to go from a party to a bar. Their son Brian was born in August 1970.

Defendant testified that the two returned from Colorado in November 1970. In the summer of 1971, she picked a fight with Bruce when he came home late one evening. Defendant was bruised when Bruce shoved her into a dresser during this incident.

The couple's twin daughters, Deborah and Diane, were born five weeks premature on June 24, 1972. Defendant testified that she was upset the night before the birth because Bruce had not come home and later found out that Bruce had spent the night at his ex-wife's house. Defendant stated that their relationship improved thereafter, but recalled an occasion where Bruce slugged her in the small of her back with his fist during an argument. Defendant went to the hospital for X rays, which turned out negative.

The couple and their children moved into the house in Hoffman Estates in June 1974. In August 1975, defendant visited her ill father. Upon her return, Bruce told defendant that he was seeing someone and moved out of the house, though Bruce continued to provide financial support.

Defendant stated that in October 1975, she hired a baby sitter and went out for an evening with her friends. When she returned home at 1:30 a.m., she found Bruce's van in the driveway. Defendant found that the children were sleeping and that Bruce had been drinking. Bruce accused defendant of seeing someone, then slapped, punched and threw defendant to the floor. Defendant testified that Bruce left after the noise awakened the children. Defendant went to the hospital the next day, where her ribs were taped. Defendant testified that she did not tell anyone what happened. Defendant testified that she asked Bruce to return, which he did in November 1975. According to

defendant, Bruce told her that he wanted to get married, but later missed appointments for blood tests.

Defendant testified that in the first six years with Bruce, she could recall him hitting her on three occasions. Defendant stated that she caused the fights by becoming upset with him, but testified that she did not strike Bruce until 1980.

Defendant also testified that during an argument in March 1976, Bruce pushed her to the floor, straddled her, pulled her arms behind her back, grabbed her head by the hair and smacked her face on the floor, splitting her nose wide open and leaving a puddle of blood. Bruce was upset with what he did and missed work by taking her to the hospital. Defendant testified that she told friends and neighbors that she was injured in a fall.

In October 1976, while defendant and the children were at the gas station where Bruce worked, defendant saw Bruce kissing a woman defendant knew as Barbara. Defendant testified that her brother David was also at the station at that time and saw Bruce threaten to break defendant's back if she did not leave.

Defendant then testified that in December 1976, Bruce again punched her in the back during an argument.

Rebekah Ford was born on October 7, 1977.

In the summer of 1978, the couple and their children moved into another house on the same street in Hoffman Estates. Defendant's brother stayed with them in this house that summer. In July or August 1978, defendant and Bruce argued over money for the children. Bruce pinned defendant's arms, slapped her and punched her. While Bruce always gave defendant his paycheck, their relationship at this point was not good.

In the summer of 1979, defendant visited her parents for 10 days. Upon defendant's return, her brother told her that Barbara had stayed at the house in defendant's absence. An argument ensued between defendant and Bruce.

Defendant testified that by the fall of 1979, she was crying all the time, becoming upset and angry in front of the children. Defendant stated that she became so depressed that Bruce took her to Forest Hospital, where the entire family was interviewed. Defendant asked Bruce to move out of the house.

According to defendant, she and Bruce fought again near Christmas 1979; Bruce slammed her head into a television set and pulled her hair. Defendant told Bruce she was fed up, and Bruce left. Defendant went to a hospital and told a nurse and a police officer about the beating. Defendant was told about a shelter.

Defendant recalled an incident in the spring of 1980 where Bruce and defendant were driving somewhere in Bruce's van and Bruce refused to stop for defendant to buy cigarettes. Bruce began to hit defendant. Defendant stepped out of the van with Rebekah while the van was still moving. Defendant phoned a neighbor to retrieve her.

In June 1980, Bruce filed for custody of the children. Defendant testified that Bruce did so a few days after she had filed charges against him, claiming that he choked her during an argument over Barbara. Defendant filed countercharges against Bruce, alleging continuing harassment.

In July 1980, defendant took the children and stayed with a friend in De Kalb, Illinois. Defendant's attorney told her to return the children. Upon defendant's return, Bruce threatened to leave with the children; a struggle ensued. According to defendant, she bit Bruce's arm, and Bruce punched her until she fled to the bathroom. It was during this fight that defendant had gone to the window and yelled to the girls outside that they should call the police. Defendant also testified that Bruce later left with the children for a few days.

Defendant then filed a complaint seeking the return of the children. An agreed order was entered providing that the children would remain in the house and that Bruce and defendant would occupy the house on alternating weeks. Defendant testified that this was stressful on the children.

In November 1980, the court ordered that defendant vacate the house entirely. The order granted defendant visitation rights on weekends, Tuesday and Thursday evenings, and holidays. Defendant would be permitted to take the children from the house every other weekend. However, defendant only took Rebekah because the older children refused to leave the house.

Defendant testified that in August 1981, she found Rebekah alone in the street outside the house while Bruce was working. Defendant filed a petition for emergency relief. An agreed order allowed defendant to keep Rebekah until August 22, 1981, when she was ordered to return the child to the Ford house.

Defendant was then allowed to use diaries that detailed her contacts with Bruce to refresh her recollection of other events that occurred in 1981. Defendant then began to testify about every contact she had with Bruce in 1981, beginning with January 3, 1981. During defendant's testimony regarding March 27, 1981, the trial court ordered a sidebar to determine whether the parties could reach an agreement regarding the testimony which would speed the trial. Reaffirming a previous ruling, the trial court informed defendant that her

testimony would be restricted to incidents of physical abuse and could not encompass denial of visitation or harassment. Defendant made an offer of proof regarding the approximately 40 to 50 incidents that she wanted to relate to the jury. Proceeding through each incident, the trial court sustained the State's objection to testimony about incidents that did not involve physical abuse.

Before the jury, defendant testified without objection that several times during 1981, Bruce denied her visitation with the children. She testified that on many other occasions, Bruce would follow her around the house during visitation, making rude comments and telling the children that defendant did not love them. Bruce would not let defendant put the children to bed. Defendant also testified that he would hang up on her when she would attempt to phone her children.

Defendant testified that on May 14, 1981, when she arrived to take Rebekah on visitation, Bruce put Rebekah in the bathtub. In the bathroom, defendant and Bruce argued about the children. Bruce slammed defendant's hand in a sliding glass door. Rebekah stood crying in the bathtub. Defendant tried to comfort Rebekah, while Bruce tried to grab Rebekah away from defendant. Defendant eventually left the house.

On June 21, 1981, defendant went to a soccer game in which the twins were involved. Defendant testified that she was supposed to have visitation with Rebekah until 7:30 p.m. Bruce came over to the car and attempted to awaken Rebekah and remove her from the car. Bruce told defendant that she was never going to see Rebekah again. Defendant testified that Bruce twisted her arm behind her back and almost broke it. Defendant got back into her car. Bruce and Brian got into Bruce's truck. Bruce attempted to hit her with his truck. According to defendant, as she drove to a friend's house, Bruce kept ramming the rear end of her car and attempted to run her off the road. Arriving at her friend's house, Brian got out of the truck and began pounding on her car. Bruce and Brian eventually left. Defendant returned Rebekah to the Ford house later that day.

On Friday, December 18, 1981, defendant picked up Rebekah for a weekend visitation. The two left for Texas the next day. Defendant testified that she was afraid of Bruce and tired of his harassment. Defendant testified that Bruce would not let defendant see her older children and she was afraid Bruce would finally kill her. Defendant stated that she took Rebekah because Rebekah wanted to be with her and she wanted to protect Rebekah from Bruce turning Rebekah against her.

On cross-examination, defendant admitted that her strict Catholic upbringing did not stop her from dating Bruce while he was married or from living with Bruce and having children out of wedlock. Defendant testified that Bruce was still married to Linda when defendant became pregnant with Brian. She further admitted that she lived with Garold in Texas and had also accused him of abuse.

Defendant testified that Bruce always apologized for hitting her and that she believed he was sorry. Defendant indicated that while she had trusted neighbors and many friends, she never told anyone about Bruce abusing her. Defendant testified that she would take Bruce back because she was emotionally and financially tied to him. She never sought counselling for Bruce, her children or herself.

Defendant testified that after Bruce began working at a gas station in Highland Park in 1976, defendant made the 45-minute drive there at least weekly. Defendant testified that she saw Bruce with Barbara at the station in 1978.

Defendant admitted that she was at a neighbor's house when Brian was struck by a car while riding his "Big Wheel." Defendant also admitted that she once struck Diane with a book, though she maintained that this was an accident. Defendant further admitted that she used Rebekah as a shield when Bruce hit her in 1979 and that she always picked Rebekah up when Bruce would attack her.

Defendant testified that she began having problems with her children in 1980, when Bruce filed for custody. Defendant claimed that Bruce also changed at this time, working shorter hours and showing more interest in the children. Despite her problems with Bruce at the Ford house, defendant never considered having any of the custody orders changed so that she could have visitation at a neutral place or have others pick up the children.

Defendant indicated that she had decided to take Rebekah from the Ford house in December 1981. Defendant testified that she told Bruce she was taking Rebekah to Texas and that she thought she had temporary custody of Rebekah at the time. Defendant admitted that she did not have a court order or Bruce's consent to remove Rebekah from Illinois. Defendant then testified about her life in Texas and California, as well as her efforts to conceal her whereabouts.

In rebuttal, the State called Brian Ford, Ernest Garold Davisson, Jr., and Bruce Ford III. Marianne Whitcomb testified in surrebuttal. The State and defendant stipulated that three other people from Bruce's neighborhood would testify that Bruce had a reputation for violence.

At the instructions conference, defendant sought to include instructions that would define the defense of fleeing an incidence or pattern of domestic violence. The trial court refused the proffered instruction. Over defendant's objection, the trial court decided to instruct the jury with Illinois Pattern Instructions, Criminal, No. 3.01 (2d ed. 1981) (hereinafter IPI 2d No. 3.01), which does not require the State to prove the date of the offense.

Following closing arguments, the trial court instructed the jury. During jury deliberations, the jury asked the trial court to define a "pattern." The trial court told the jury to rely on its common sense. The jury also asked the trial court to define "domestic violence" before 1980 and after 1980. The trial court told the jury to rely on its common sense. The jury eventually returned a guilty verdict on March 22, 1991. Defendant filed a timely notice of appeal.

I

Initially, defendant contends that she was denied a fair trial because the trial court limited the evidence in support of her defense that she was fleeing an incidence or pattern of domestic violence. The child abduction statute provides:

"(c) It shall be an affirmative defense that:
* * *

(3) The person was fleeing an incidence or pattern of domestic violence." (Ill. Rev. Stat. 1987, ch. 38, par. 10—5(c)(3).)

The child abduction statute does not define the term "domestic violence." Defendant contends that the term should be defined with reference to the Illinois Domestic Violence Act of 1986 (Ill. Rev. Stat. 1987, ch. 40, par. 2311—1 et seq.) (the 1986 Act). The 1986 Act provides in part:

"(1) 'Abuse' means physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person in loco parentis.
* * *

(3) 'Family or household members' includes spouses, former spouses, parents, children, * * * persons who share or formerly shared a common dwelling and persons who have or allegedly have a child in common.

(4) 'Harassment' means knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner.

Unless the presumption is rebutted by a preponderance of the evidence, the following types of conduct shall be presumed to cause emotional distress:

\* \* \*

(v) repeatedly threatening to improperly remove a child of petitioner's from the jurisdiction, improperly concealing that child from petitioner or making a single such threat following an actual or attempted improper removal or concealment." (Ill. Rev. Stat. 1987, ch. 40, pars. 2311—3(1), (3), (4)(v).)

The State responds that despite the above definitions, the term "domestic violence" is not defined in the 1986 Act. Though not cited by defendant, section 227 of the 1986 Act, which concerns privileged communications between domestic violence counselors and victims, provides as follows:

"(a) As used in this Section:

\* \* \*

(5) 'Domestic violence' means abuse as defined in the Illinois Domestic Violence Act." (Ill. Rev. Stat. 1987, ch. 40, par. 2312—27.)

The Illinois Domestic Violence Act (Ill. Rev. Stat. 1985, ch. 40, par. 2301—1 *et seq.*) (the original Act), repealed by the 1986 Act, defined "abuse" similarly to the definition of the 1986 Act. The original Act, however, did not define the term "harassment."

The parties both rely upon *People v. Welacha* (1989), 186 Ill. App. 3d 860, 542 N.E.2d 927, which appears to be the only reported case involving this statutory defense. The State also cites *People v. Dworzanski* (1991), 220 Ill. App. 3d 185, 580 N.E.2d 1263, but that case discusses the necessity defense, not the statutory defense at issue here. In *Welacha*, this court held that a trial court may find incidents of abuse insufficient to overcome evidence of guilt where the alleged abuse occurs several months prior to the abduction. *Welacha*, 186 Ill. App. 3d at 863-64, 542 N.E.2d at 929-30.

The decision to admit or exclude testimony is generally committed to the trial court and will not be reversed absent a clear abuse of discretion. (*People v. Ward* (1984), 101 Ill. 2d 443, 456-57, 463 N.E.2d 696, 702.) Testimony can be excluded where it is merely cumulative of other testimony or evidence. *Ward*, 101 Ill. 2d at 456, 463 N.E.2d at 702.

■ In this case, given the detailed testimony regarding the relationship between defendant and Bruce through March 1981, the testimony of repeated harassment throughout 1981, including specific incidents of harassment and abuse that the record indicates ended more

than a month before the abduction, further elaboration could be deemed cumulative. Thus, the trial court acted within its discretion in this instance.

## II

Defendant next contends that the trial court erred in refusing to include definitions from the 1986 Act in the jury instructions. Generally, the decision to submit a nonpattern instruction to the jury rests within the sound discretion of the trial court. (*People v. Matthews* (1984), 126 Ill. App. 3d 710, 713, 467 N.E.2d 996, 999-1000.) Jury instructions generally must convey to a jury the correct principles of law, so that the jury can apply the law to the facts of the case and arrive at a proper conclusion. (*People v. Hester* (1989), 131 Ill. 2d 91, 98, 544 N.E.2d 797, 801.) A defendant is entitled to an instruction consistent with her defense if it is supported by evidence. *People v. Solis* (1991), 216 Ill. App. 3d 11, 18, 576 N.E.2d 120, 124.

In this case, the instructions conveyed the correct principles of law to the jury and included defendant's statutory defense. Defendant requested an instruction containing language from the 1986 Act, but nonpattern instructions in criminal cases should be simple, brief, impartial and free from argument. (134 Ill. 2d R. 451(a).) The proffered instruction was long, complex and could have unduly drawn the jury's attention to particular pieces of evidence. Accordingly, given the facts and circumstances presented by the record on appeal, we cannot say that the trial court abused its discretion in refusing defendant's instruction.

## III

Finally, defendant argues that the trial court erred by giving the jury IPI Criminal 2d No. 3.01, that did not require the State to prove the exact date of the abduction, because the statute of limitations was at issue. The State responds that the statute of limitations was tolled during the period that defendant was not usually and publicly resident in Illinois.

Defendant admits that an instruction relieving the State of the burden of proving the exact date of the offense may be proper. (See *People v. Vaughn* (1945), 390 Ill. 360, 370, 61 N.E.2d 546, 550.) Generally, the State need only prove that the offense was committed within the relevant limitations period and prior to the date the indictment was returned. See *People v. Barlow* (1989), 188 Ill. App. 3d 393, 403-04, 544 N.E.2d 947, 954.

■ In this case, the State sought IPI Criminal 2d No. 3.01 because it did not want to argue over whether the offense was committed when Rebekah was picked up on December 18, 1981, or when Rebekah was taken from Illinois on December 19, 1981, or when defendant failed to return Rebekah on December 20, 1981. Moreover, defendant does not dispute that she performed those acts on those dates and resided in Texas and California until her arrest in 1989. Given the facts and circumstances of this case, the trial court acted within its discretion in giving the instruction.

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.