THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID MORLEY, Defendant-Appellant.

Second District   No. 2—92—0515

Opinion filed January 14, 1994.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, David Morley, was found guilty of two counts of attempted first degree murder, two counts of aggravated discharge of a firearm, and a single count each of armed violence and aggravated battery with a firearm. The charges against defendant arose from his involvement in a shoot-out on May 7, 1991, with two Round Lake Beach police officers, one of whom, Detective David Ostertag, was struck by a bullet and seriously wounded. Defendant was sentenced to an extended term of 50 years' imprisonment for the attempted murder of Detective Ostertag to run consecutively to a sentence of 30 years' imprisonment for the attempted murder of the other officer, Detective Gary Bitler. On appeal defendant raises the following issues: (1) whether the trial court improperly admonished a defense witness, denying defendant the right to due process; (2) whether defendant was denied equal protection of the law by the prosecution's use of a peremptory challenge against the only black prospective juror; (3) whether the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" as used in the extended-term sentencing provisions of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2) (now codified, as amended, at 730 ILCS 5/5—5—3.2(b)(2) (West 1992))) is unconstitutionally vague in violation of the eighth amendment; (4) whether the trial court erred in finding the attempted murder of Detective Ostertag to have been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; and (5) whether the convictions of offenses other than attempted first degree murder must be vacated.

On the evening of May 1, 1991, two Round Lake Beach police officers observed suspicious activity at a self-storage facility. Upon investigation, they discovered defendant and James Files, a codefendant who was tried separately, inside a storage unit standing next to a vehicle that was later found to have been stolen. Files fled on foot, and defendant was taken into custody and charged with possession of a stolen motor vehicle. Defendant was released on bond with a scheduled court appearance on the morning of May 7, 1991. At one point while in custody defendant encountered Detective Ostertag while De-

tective Ostertag was conducting a prisoner check. They discussed defendant's bond hearing.

Defendant failed to appear in court on the morning of May 7. That afternoon, Detectives Ostertag and Bitler were driving north on Rand Road in an unmarked car. Both detectives were in plain clothes, and Detective Ostertag was driving the vehicle. As they approached the intersection of Rand Road and Plum Grove Road, Detective Bitler observed Files filling his car, a grey Pontiac, at a gas station located at the northeast corner of the intersection. Detective Bitler had been shown a photograph of Files and recognized him by his long grey hair. Detectives Bitler and Ostertag drove into the gas station, by which time Files was paying for the gasoline. Defendant was in the driver's seat of the Pontiac.

According to Detective Ostertag, as Files was returning from the cashier's booth he looked in the direction of the unmarked police car and ran to the Pontiac and jumped in, and the Pontiac sped away. The detectives pursued the Pontiac travelling north on Rand Road. During the pursuit, the detectives activated their vehicle's siren and "wig-wag" lights, which are white flashing lights mounted near the vehicle's head lamps. The detectives also placed an oscillating red lamp on the vehicle's dashboard and transmitted a report of the incident by radio. According to Detective Ostertag, during the pursuit, the police vehicle reached speeds of up to 85 miles per hour.

Kildeer Police Chief Jay Mills was driving in a marked squad car when he came upon the two vehicles travelling at a high rate of speed through the intersection of Rand Road and Long Grove Road. Chief Mills heard the police vehicle's siren and saw its headlights and the red light on the dashboard. Chief Mills had previously heard a radio report of the pursuit, and he followed behind the unmarked police vehicle, activating the flashing light and siren on his vehicle. Chief Mills was approximately 200 feet behind Detective Ostertag's and Detective Bitler's vehicle.

Shortly after passing through the intersection of Rand Road and Long Grove Road, the Pontiac made an abrupt right turn into a driveway and struck a tree. During the pursuit, Detective Ostertag had observed Files reaching into the backseat and retrieving an object. After the Pontiac had come to rest, Detective Ostertag saw Files holding a chrome semiautomatic pistol and attempting to exit the vehicle on the passenger side. Detective Ostertag drove the police vehicle into the passenger door of the Pontiac to block Files' exit. Detective Ostertag then shut the siren off. Files was sliding across the passenger seat of the Pontiac toward the open driver's side door. De-

tective Ostertag exited the police vehicle in a crouching position and moved toward the rear. At that point Detective Ostertag looked up and saw defendant pointing a blue steel semiautomatic handgun at him over the roof of the Pontiac. Defendant fired one shot from a distance of about eight feet, striking Detective Ostertag in the chest.

Detective Ostertag began backing up when he heard five or six shots emanating from where defendant and Files were located. Detective Ostertag heard the bullets passing him on both sides as he was backing out. Now at the back of the police vehicle, Detective Ostertag heard Detective Bitler fire a shot and heard one or two more shots from defendant and Files' direction. Detective Bitler fired several shots in rapid succession. Detective Ostertag then removed his pistol and fired two shots at defendant and one shot at Files. At that point defendant and Files fled on foot. According to Detective Ostertag, the amount of time from the first gunshot to the last was about 25 seconds. Chief Mills was approaching the scene as the shots were being fired, and numerous law enforcement officers arrived shortly thereafter. Detective Ostertag testified that he wore his badge attached to his belt at the time of the shooting. Detective Bitler provided a similar account of the incident.

After a search of the area, defendant was located hiding in a section of pipe in the vicinity of the shoot-out. He was holding a handgun, but surrendered without incident when a police officer approached him with his gun drawn. Several clips of ammunition and a box of ammunition were recovered from defendant in addition to his weapon. James Files was discovered submerged in a swamp with only his head and hands above water. Later, a valise of some sort containing an AK 7.62-semiautomatic rifle was recovered from the swamp near where Files had been discovered. A search of the vehicle driven by defendant and Files produced a canister containing 520 rounds of ammunition for a weapon of that type.

All of the weapons involved in the shoot-out were semiautomatic handguns, which expel a spent shell casing after each shot is fired. A total of 14 shell casings were recovered from the scene. Five casings came from defendant's weapon; seven casings came from Detective Bitler's weapon; and two casings came from Detective Ostertag's weapon.

Defendant testified that for several months prior to May 1991 he had been assisting James Files in the operation of a "chop shop," which involves dismantling stolen automobiles in order to sell the parts. They would strip the cars in rented storage space and dispose of what remained in rural areas. Based on conversations with Files,

defendant was aware that Files had been involved in such operations in the 1970's. From these conversations, defendant was aware that organized crime figures required chop-shop operators to pay a so-called "street tax" consisting of a large percentage of the proceeds of the operation. Files personally knew people who had been killed for refusing to pay the street tax.

According to defendant, shortly prior to May 7, Files had been summoned for a meeting with members of "the syndicate" at noon in the lobby of the Melrose Park Inn. Defendant accompanied Files to the meeting to serve as Files' "backup" in case of problems. Defendant was armed and he waited about 20 to 30 feet away as Files met with two individuals in the lobby. Defendant heard portions of the conversation, and after the meeting, Files told defendant that he had offered the individuals a few thousand dollars, but the offer was unsatisfactory. Files told defendant "we are out of business or they're gonna [sic] kill us."

After the meeting in Melrose Park, defendant and Files proceeded toward Lake Zurich. When they saw the unmarked vehicle in which Detectives Ostertag and Bitler were travelling pull out after them when they left the gas station on Rand Road, Files said it "might be a hit." The chase on Rand Road followed. When the unmarked car rammed them after they had struck a tree, Files shouted that it was a hit. Defendant testified that the occupants of the other vehicle fired the first shots, and defendant fired back in self-defense. Defendant also testified that he did not hear sirens or see a red light on the car that was chasing them.

John Clarke, a consultant knowledgeable about organized crime, testified on behalf of defendant. According to Mr. Clarke, the chop-shop industry is dominated by organized crime, and it would be unusual for someone to be able to operate a chop shop without being subject to extortion. Organized crime figures would meet with chop-shop operators to demand an "honorarium" or "street tax," and recalcitrant operators would be seriously injured or killed. Mr. Clarke also testified that organized crime figures are known to travel in high performance vehicles outfitted to resemble police or government vehicles.

Defendant first argues that a series of comments made by the trial judge to James Files, whom defendant intended to call as a witness, regarding Files' right not to testify, exceeded the scope of a proper admonition regarding the privilege against self-incrimination. Defendant maintains that the trial judge's comments caused Files to withhold his testimony and defendant was thereby deprived of his right to due process.

The facts relevant to this contention are as follows. On the third day of trial, before the State called its final witness, Files' attorneys appeared, ostensibly to quash a subpoena for Files' testimony. It was established, however, that Files had indicated that he had voluntarily decided to testify, and the trial court determined that the motion to quash was "moot." Defendant's attorney indicated that two or three days prior to trial he had learned that Files desired to testify on defendant's behalf. Files' attorney explained to the trial court that he had recommended that Files decline to testify and had fully explained the privilege against self-incrimination and the possible consequences of a waiver of the privilege, including the fact that Files could not re-assert the privilege during cross-examination. Thereafter, the trial judge spoke directly to Files, asking him, *inter alia*, whether his decision to testify on behalf of defendant was voluntary; whether any threats or promises had been made; whether he understood that he had a constitutional right not to testify; whether he understood the nature of the charges against him and the penalties involved; and whether he understood that he would be subject to cross-examination. Thereafter, Files' attorney engaged in an exchange with Files to confirm that Files had previously been informed of his rights by his attorneys and that his attorneys had advised Files not to testify. At this point, the following exchange occurred:

"THE COURT: Why are you doing it?

MR. FILES: Why am I doing it? Mr. Morley is like family to us. We was [*sic*] not in commission of a felony. We had committed no crime at that point. I knew I had property in Round Lake Beach; but I wasn't expecting anybody to stop us on the highway. We had a very strenuous argument down in Melrose Park area; and I don't really want to see Mr. Morley get blamed entirely for everything. I don't think he was entirely at fault for everything.

THE COURT: Have you—

MR. FILES: We both possibly panicked.

THE COURT: Have you asked your lawyer the potential lack of any effect your testimony might have on this trial?

MR. FILES: Oh, I don't—go through that one more time.

THE COURT: Has your lawyer mentioned that your testimony might have no effect on the outcome of this case?

MR. FILES: Yes, he did; but I could never rest easy if I didn't try. ***

THE COURT: I want you to think about the potential impact for a few minutes and talk to your lawyers about that. All right?

MR. FILES: Okay.

THE COURT: Because I think you may have an overinflated idea of what your testimony might be on this case and underinflated what the testimony might be in your case, so take five minutes. Take him to one of the jury rooms and talk to him."

Statements by defense counsel in court and defendant's post-trial motion indicate that after this exchange the trial judge entered the room where Files was consulting with his attorneys. Defense counsel overheard the trial judge tell Files that he "had a shot" in his case if he did not testify at defendant's trial and that if Files "testified in this case, there would be two convictions, instead of one." Files ultimately declined to testify. In connection with his post-trial motion, defendant obtained an affidavit from Files setting forth the content of the testimony he would have given at defendant's trial.

At this point, we note that some of the allegedly improper remarks by the trial judge appear in the record on appeal only as they are related by defendant's trial counsel. Instead of relying on trial counsel's account of these remarks, it would have been preferable for defendant to have incorporated the remarks themselves in the record on appeal by amending the record pursuant to Supreme Court Rule 329 (134 Ill. 2d R. 329). In the case at bar, this could have been accomplished, for example, by stipulation with the State or, alternatively, by preparation of a bystander's report for submission to the trial court. However, the State does not argue that the trial court's comments to Files are not properly part of the record. During the proceedings below, defense counsel, speaking on the record, reported the statements he had heard the trial judge make without a court reporter present. The trial court did not contradict defense counsel's account of the conversation, and the State did not object to defense counsel's statements. Under these circumstances we will proceed under the assumption that defense counsel's account of the off-the-record exchange is accurate.

Turning to the merits of the issue, the State contends that the case at bar is indistinguishable from *People v. Blalock* (1993), 239 Ill. App. 3d 830, where the trial judge advised a defense witness that it would be "foolish" for him to testify because of the potential danger of self-incrimination. In *Blalock* we concluded that the trial court's remarks were inappropriate, but that no reversible error occurred. As

discussed below, however, the circumstances of the case at bar call for a different result.

In *Webb v. Texas* (1972), 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351, the United States Supreme Court held that the threatening manner in which the trial court admonished the defendant's sole witness about the consequences of perjury "effectively drove [the] witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." (409 U.S. at 98, 34 L. Ed. 2d at 333, 93 S. Ct. at 353.) In *Webb*, the proposed defense witness had a prior criminal record and was then serving a prison sentence. When the witness was called to testify, the trial court stated, *inter alia*:

> " 'It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you.
>
> If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [*sic*] is that you would get convicted of perjury and it would be stacked onto what you have already got ***. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. *** You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.' " (409 U.S. at 95-96, 34 L. Ed. 2d at 332, 93 S. Ct. at 352.)

The Supreme Court noted that the trial judge "singled out this one witness for a lengthy admonition on the dangers of perjury." (409 U.S. at 97, 34 L. Ed. 2d at 333, 93 S. Ct. at 353.) The Court further noted that the trial judge had implied that he expected the witness to lie and assured the witness of severe consequences of doing so. (409 U.S. at 97, 34 L. Ed. 2d at 333, 93 S. Ct. at 353.) Although some of the trial judge's threats may have been beyond his power to carry out, the Court noted that "in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." 409 U.S. at 98, 34 L. Ed. 2d at 333, 93 S. Ct. at 353.

As the State correctly notes, the subject matter of the trial judge's comments in the case at bar differs from the subject matter of the comments at issue in *Webb*. In *Webb* the comments pertained to the consequences of perjury while here the comments pertained to the possibility and potential consequences of self-incrimination. We noted this distinction in *People v. Blalock* (1993), 239 Ill. App. 3d 830, 837. It is true that cases in which a trial judge's admonitions to a defense witness have been considered have frequently involved threats or warnings regarding prosecution for perjury (as was the case in *Webb*), or threats that the witness' testimony could jeopardize a plea agreement that the witness has entered into in connection with the witness' prosecution for the same offense. (See generally Annot., 88 A.L.R.4th 388, 438-50 (1991).) However, defendant has cited cases from other jurisdictions illustrating that *Webb* is also applicable where the trial court's comments relate to the risk and consequences of self-incrimination. (See *United States v. Arthur* (6th Cir. 1991), 949 F.2d 211; *People v. Schroeder* (1991), 227 Cal. App. 3d 784, 278 Cal. Rptr. 237.) A trial court has the discretion to warn a witness of possible incrimination when the need arises, particularly where the witness is appearing without the benefit of counsel. (*People v. Pantoja* (1976), 35 Ill. App. 3d 375, 380 (where it was "manifestly clear" that witness was not aware he was in danger of subjecting himself to further prosecutorial actions on the basis of his in-court testimony, it was appropriate for attentive trial judge to inform witness of his fifth amendment rights and to appoint a public defender for the purpose of consultation).) In *Arthur* the United States Court of Appeals for the Sixth Circuit noted, however, that an abuse of this discretion can occur "when the [trial] court actively encourages a witness not to testify or badgers a witness into remaining silent." (*Arthur*, 949 F.2d at 215-16.) Similarly, in *People v. Schroeder* (1991), 227 Cal. App. 3d 784, 278 Cal. Rptr. 237, cited by defendant, the California Court of Appeal stated that, in seeking to ensure that a witness is fully apprised of his or her fifth amendment rights, a trial court may appoint counsel to advise the witness, or the court may advise the witness itself. "If the court chooses the latter, it 'must walk the fine line between, on the one hand, fully advising the witness of the danger of self-incrimination and the right not to testify, and, on the other hand, threatening the witness to an extent which materially impairs the defendant's due process right to present witnesses in his defense.' " (227 Cal. App. 3d at 788-89, 278 Cal. Rptr. at 239, quoting *People v. Warren* (1984), 161 Cal. App. 3d 961, 972, 207 Cal. Rptr. 912, 918.) In *Blalock* we acknowledged the holding in *Schroeder*, but, without specifically ex-

pressing any opinion as to its reasoning, we found *Schroeder* to be factually distinguishable.

Shortly after we decided *Blalock*, in *People v. King* (1993), 154 Ill. 2d 217, our supreme court determined that a trial judge's comments to a defense witness indicating that the witness' testimony could result in the invalidation of his plea agreement were improper and resulted in prejudice to the defendant when the witness declined to testify. Although *King* did not involve an admonition regarding the privilege against self-incrimination, we do not believe the general analytical framework set forth in *King* is dependent on the precise nature or content of the trial court's admonition, and we will apply the same general analysis in the case at bar. See also *People v. Mancilla* (1993), 250 Ill. App. 3d 353.

In *King* the defendant and a codefendant, Dwayne Cheers, were charged with robbery. Cheers entered into a plea agreement, stipulating that if called to testify, the victim would identify Cheers and defendant as the perpetrators. As part of the plea agreement the trial court agreed to sentence Cheers to eight years' imprisonment. Prior to Cheers' sentencing, defendant called Cheers to testify. The trial court told Cheers that it was the court's recollection that as part of his plea agreement Cheers stipulated that he committed the robbery with defendant. The trial court told Cheers, "if you do testify and you testify in a manner that I believe is perjurious, which would be not the truth, I would, on my own motion, vacate the plea of guilty. *** However, if you testified in this matter *** in what I believe is a truthful manner, I would not vacate that plea and I would allow you then to be sentenced to the 8 years that we previously agreed upon." (154 Ill. 2d at 221.) Cheers then, in effect, denied that he had stipulated that defendant was involved in the offense. The trial court then advised Cheers of his fifth amendment right against self-incrimination, at which point Cheers indicated that he would not testify. Following defendant's conviction, defendant's attorney obtained an affidavit from Cheers indicating, *inter alia*, that Cheers committed the robbery with an individual other than the defendant. Cheers' affidavit also stated that he would have testified at defendant's trial, but he was afraid that if he did testify, the trial court would not sentence him to term of imprisonment for which he had plea bargained. After summarizing the decision in *Webb*, our supreme court undertook the following analysis:

> "In *Webb*, the Court focused on the effect that the judge's admonitions had on the potential witness. A relevant issue in the

present case, therefore, is what effect the statements made by the trial judge had on Cheers.

　　We believe that the trial judge's admonitions could have caused Cheers to assert his fifth amendment right against self-incrimination. Causation alone, however, is not enough to violate the rule announced in *Webb*. A judge may admonish a potential witness although the judge's comments cause the potential witness not to testify. [Citations.]

　　For a trial judge's admonitions to a potential witness to violate the due process rights of the accused, the admonitions must be somehow improper. For example, the Court in *Webb* characterized the trial judge's admonition as 'unnecessarily strong' and 'threatening.' " 154 Ill. 2d at 224.

The *King* court found that the admonition in that case was improper. The court noted that the trial court misstated the facts in admonishing Cheers. Contrary to the trial judge's comments, Cheers had not stipulated to the defendant's involvement in the offense. Cheers had stipulated that the *victim* would identify the defendant as one of the robbers. The court concluded that "[t]he trial judge forced Cheers to choose between not testifying and taking a chance that the trial judge would withdraw his offer to sentence Cheers to eight years' imprisonment. The trial judge's mistaken admonitions to Cheers, therefore, were improper and could have caused Cheers not to testify." (154 Ill. 2d at 225.) Finally, the court examined whether the defendant was prejudiced by Cheers' refusal to testify noting that "defendant was not deprived of due process if Cheers' testimony would have had no effect on defendant's verdict." 154 Ill. 2d at 225.

Applying this analysis to the case at bar, we first consider the question of "causation." Although Files' affidavit does not expressly state that his decision not to testify was the result of the trial court's admonition, like the court in *King* we believe the admonition in the present case "could have caused" Files not to testify. (See *King*, 154 Ill. 2d at 225.) The record reflects that prior to receiving the trial court's admonition Files was determined to testify notwithstanding his attorneys' advice to the contrary. Files indicated that "he could never rest easy" if he did not try to help defendant. However, shortly after the trial court spoke with Files, he changed his mind. In this respect, the case at bar is distinguishable from *Blalock*, where, in light of the particular comments made by the judge, the statement by the witness' attorney that the witness was following the advice of counsel in declining to testify and the fact that the witness announced his decision the day after the trial court's admonition, we concluded that

"the trial court's warning had little persuasive effect on [the witness], but allowed him the additional time to make an informed decision." (*Blalock*, 239 Ill. App. 3d at 837.) The circumstances of the case at bar do not warrant a similar conclusion.

Next, pursuant to *King* we must consider whether the trial court's admonition was "improper." (*King*, 154 Ill. 2d at 224.) "When determining whether a trial judge's admonitions to a potential witness are proper, the facts and circumstances of the case must be considered." (*King*, 154 Ill. 2d at 225.) Here the trial judge went beyond merely ensuring that the witness properly understood the privilege against self-incrimination and the general implications of waiving the privilege. Instead, the trial court offered a prediction of the precise consequences of a decision to testify, namely, that there would be "two convictions instead of one." We find this statement to be significantly more intimidating than the trial court's inappropriate, but somewhat generalized, comment in *Blalock* that a decision to testify would be "foolish." In the case at bar, in attempting to evaluate the precise consequences of a decision to testify, the trial court in essence departed from its neutral judicial role and acted as counsel to the witness, expressing opinions as to the strength of the cases against both defendant and Files. We conclude that the admonition given was improper within the meaning of *King*.

Finally, under *King* in order for the improper admonition to constitute reversible error, defendant must show prejudice. While Files' proposed testimony would have been somewhat duplicative of defendant's testimony, we believe Files' testimony could have more clearly established the involvement of and threat by organized crime to the chop-shop operation, creating a more credible basis for defendant's assertion that he thought the pursuit by plainclothes officers in an unmarked car was a "hit." Moreover, defendant has noted that while his own testimony was subject to impeachment on the basis of a prior conviction of bank robbery, there is no indication that Files' testimony could have been similarly impeached. The State argues that the defense's theory of self-defense based on defendant's alleged belief that Detectives Ostertag and Bitler were "hit men" is "farfetched." While the defense theory is somewhat unusual, it is not implausible in light of the evidence presented. We cannot conclude that the failure of Files to testify did not affect the verdict. Accordingly, defendant is entitled to a new trial. Although defendant has not raised any issue regarding the sufficiency of the evidence to sustain the verdicts against him, we note that the evidence presented by the State was sufficient to prove defendant's guilt beyond a reasonable doubt, and

therefore retrying defendant will not violate the principles of double jeopardy. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 309; accord *People v. Dworzanski* (1991), 220 Ill. App. 3d 185, 200-01.) In view of our disposition on this basis, we need not address defendant's remaining arguments.

For the foregoing reasons, the judgment of the circuit court of Lake County is reversed and the cause remanded for a new trial.

Reversed and remanded.

WOODWARD and GEIGER, JJ., concur.