THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ABIODUN SOWEWIMO, Defendant-Appellant.

First District (5th Division)   No. 1—93—2771

Opinion filed October 27, 1995.—Rehearing denied December 12, 1995.

332

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William Carroll, and Catherine Chaskin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

Defendant Abiodun Sowewimo was convicted in a bench trial of two counts of aggravated criminal sexual assault, aggravated unlawful restraint, stalking, aggravated stalking, attempted first degree murder, and aggravated discharge of a weapon. On appeal, defendant alleges (1) he was denied his constitutional right to testify in his own behalf when the court and his trial lawyer pressured him to forego his testimony; (2) the offense of aggravated discharge of a firearm is a lesser included offense of attempted murder resulting from the same course of conduct; (3) Illinois' stalking statutes are unconstitutional; (4) the evidence was insufficient to support his convictions for attempted murder, stalking, or aggravated stalking; (5) he was denied effective assistance of counsel; (6) he was denied his right to cross-examine and present crucial evidence; and (7) his sentence was illegal, excessive, and unconstitutional.

We affirm in part and vacate in part.

P.S. testified that she began a relationship with the defendant in December of 1991. On August 7, 1992, P.S. let the defendant have

her car to go replace a key for the car door which defendant had previously lost. After work, P.S. went to the defendant's home to get her car. Defendant claimed that a friend was going to get the car, and he refused to let P.S. leave his bedroom for 30 minutes, running to the door when she tried to leave. P.S. then told the defendant, "Jude, I'd rather be dead than be with you." The defendant then picked a switchblade knife up off a table and put it to her throat saying, "What did you say? You would rather be what than be with me?" The defendant forced her to remain for five more hours, and at midnight, defendant gave P.S. money to take a cab home.

At 5 a.m. that morning, the defendant came to P.S.'s apartment and kept ringing her doorbell. P.S. let him in, and the defendant appeared drunk and passed out a few minutes later. P.S. went through his pockets and found her car keys, and she went outside and located her car on the street. She drove around for a few hours and called up her apartment at 9 a.m., telling the defendant she wanted him to leave. When she returned, he was on her bed naked. She told him he was disrespecting her and that she did not want to have anything to do with him. He grabbed her arm, but she swung away and left the apartment.

After leaving, P.S. called her sister to warn her that the defendant would probably go to the sister's home to look for P.S. P.S. asked her sister to meet at P.S.'s apartment. P.S. went back to her apartment, which the defendant had left by this time. She met her sister there and they soon left to run errands. P.S. and her sister went to her sister's home around 4 p.m. on August 8, 1992. The defendant made repeated calls there which were answered by others in the house. Eventually P.S. picked up one of the defendant's calls, and the defendant told her, "You better come back or I'm going to fuck you up." The defendant called from 30 to 50 times, of which five times P.S. spoke with the defendant. P.S. called the police, and she filed a report about the threatening phone calls when they arrived at 6 p.m. that day.

P.S. returned to her apartment at 10:30 p.m. that evening to find that her back door had been broken into. No valuables were missing, but pictures of P.S. with her friends had been ripped, her answering machine was smashed, and some of her clothes were burnt in her closet. She also had a personal file taken which contained her birth certificate and bills. P.S. called the police, who came and wrote out a report.

After the police left, P.S. discovered later that night that her tires had been slashed. The next morning, August 9, 1992, P.S.'s sister also discovered her car's tires were slashed and a headlight

was smashed. The two sisters again called the police and filed a report. They also had their locks changed.

The defendant called P.S. three or four times at her workplace, Banner Personnel (Banner), the morning of August 11, 1992. The defendant made threats towards her family and friends, telling her that they better get a bodyguard and that they were not going to see their lives in front of them. At noon that day the defendant came to Banner and asked to see P.S. P.S. did not want to see him, so a manager went out to meet him. Police officers later arrived and arrested the defendant based on P.S.'s complaint.

The defendant continued to call P.S. at work every day, and P.S. filed an additional police report on August 13, 1992. On August 21, 1992, P.S. appeared with the defendant in court regarding her complaint, and the defendant was given probation with a verbal warning from the judge not to call P.S. and to stay away from her, her family, and her workplace. The defendant continued to call P.S. at work every day through September 24, 1992, calling up to 400 times a day.

On the night of September 24, 1992, the defendant had called P.S. at her apartment at night before she had returned at 10 p.m. and had left several messages. Then the defendant called and spoke to P.S. personally. He asked P.S. where she had been that night and accused her of lying to him and playing games with him. He told her, "I'm going to fuck you and your family up."

On September 25, 1992, P.S. had an office meeting at 8:30 a.m. in the lunchroom at Banner. The defendant then walked into the lunchroom and pulled out a gun, and everybody in the lunchroom ran out. The defendant grabbed P.S. by the hair and said "I told you, P., if you don't come back to me, I was going to come and get you."

At this point Uri Armon walked into the room and told the defendant to calm down. P.S. was screaming and crying, and the defendant told her to shut up. The defendant's gun had been pointing down, and he raised it up and shot once at Mr. Armon, who turned and ran from the room. Armon left the room very quickly. P.S. thought Mr. Armon had been struck by the bullet. The defendant then closed and barricaded both doors to the room.

The defendant threw P.S. on the couch and told her, "This is the last time we're going to make love before you and I die." The defendant took off her panty hose and ripped off her underwear and had sexual intercourse with her. He finished and got dressed, and P.S. put her nylons back on. He then told her, "We're going to be on CNN, baby, A Current Affair, I told you. You didn't believe me. We're going to be on CNN, Current Affair." He kept his gun in his hand throughout the entire time.

The police arrived and began talking to the defendant through the barricaded door. The defendant told the police, "Don't play any games with me. I just shot a man. I killed a man. We're going to die before I go to prison. I'm not going to jail. We're going to die." The police attempted to convince the defendant that Mr. Armon was unharmed, and eventually they slipped under the door a picture taken of Mr. Armon with a police officer. The defendant then went to a sink and placed bullets from his gun and from his coat pocket down the sink. P.S. got on the phone and said the defendant was ready to surrender. P.S.'s underwear was still lying on the floor, and the defendant ripped it further with a kitchen knife and his teeth before putting it down the sink. The defendant then surrendered, about four hours after first confining P.S.

During cross-examination of P.S., the following colloquy ensued:

"MR. SMEETON [Defense Counsel]: How long were you in the room with him before he sexually assaulted you?

P.S.: Five minutes.

MR. SMEETON: During the next—approximately how long did that last?

P.S.: Maybe 15, 20—

MR. SMEETON: 15, 20 minutes?

P.S.: 15, 20.

MR. SMEETON: At the time—first encounter, how would you describe his behavior?

P.S.: What do you mean the first encounter with him? In that room that day?

MR. SMEETON: Was he—was he acting rational?

MR. RIECK [The State]: Objection.

THE COURT: Sustained.

MR. SMEETON: Could you describe how he acted on that particular day, his personality?

MR. RIECK: Objection.

THE COURT: Sustained."

Immediately after sustaining the objections, defense counsel was allowed to ask about the defendant's sobriety and use of drugs on the day of the incident.

Ann Johnson, vice-president of corporate operations at Banner, was in charge of receptionists at Banner. She testified that during August and September of 1992, the receptionists at Banner received an inordinate amount of phone calls for P.S., some of them abusive, which required adjusting the switchboard operators to shorter work sessions to relieve their pressures. Over three or four days Ms. Johnson personally handled 40 or 50 calls from a man with the same voice. On one day they recorded over 400 phone calls from this man.

She identified the voice as the defendant's from seeing and hearing him at Banner on September 25, 1992.

Uri Armon testified that he was at Banner at 8:30 a.m. on September 25, 1991, when he heard a crash and Ann Johnson screaming his name. He ran past Ms. Johnson and into the lunchroom to see the defendant holding a gun and grabbing P.S. by her hair as she crouched down. Mr. Armon said, "Please leave her alone. Let her go. This isn't the way to do this. Please." The defendant then raised his arm and pointed the gun directly at Mr. Armon and said, "Who the fuck are you?" Mr. Armon did not answer. The defendant said, "What the fuck do you want?" Mr. Armon again did not answer. The defendant said, "Get the fuck away from me." Armon did not move. In the same motion, the defendant turned towards P.S. and fired a shot in Armon's direction. The shot passed directly to Armon's right by his hip, and he believed it did not hit him because he had moved just a little bit. P.S. was also jerking around while being crouched down. Armon was two or three feet from the defendant when he fired. Armon immediately turned around and ran out of the room.

The State rested. The defense then moved for a directed verdict as to the count for attempted murder and presented argument. The motion was denied. The defense then rested. The State waived its closing but reserved rebuttal. The defense gave a short closing, addressing the attempted murder count only. The State then gave a short rebuttal.

After the State finished, the following colloquy ensued:

"MR. SMEETON: Judge, may we have a minute? I would like—for the record, the defendant now is informing me that he thinks he wants to say something, and I may ask the Court to allow me to withdraw the act of resting and allow him to testify, if he so insists. But would you pass the case so I can talk to him again on this matter?

THE COURT: Sure.

MR. SMEETON: Could I speak with him in the back, your Honor?

THE COURT: Sure.

(Recess taken.)

THE COURT: Is he going to testify?

MR. SMEETON: No, sir. Before the Court is the defendant. For the record, I have discussed once again with the defendant the possibility of testifying, and it is our opinion together that he should not and will not.

THE COURT: Is that correct, Mr. Sowewimo Abiodun [sic]?

MR. SOWEWIMO: Yes.

THE COURT: Do you understand you do have the right to testify even though you have rested the case?

MR. SOWEWIMO: Yeah.

THE COURT: You have a right to testify.

MR. SOWEWIMO: Yes.

THE COURT: I would allow you to do that, do you understand?

MR. SOWEWIMO: Yes.

THE COURT: You chose not to testify; is that correct?

MR. SOWEWIMO: Yes.

THE COURT: Do you want to testify or not?

MR. SOWEWIMO: Yes.

MR. SMEETON: Do you want to testify or not?

THE COURT: Do you want to testify or do you not want to testify?

MR. SOWEWIMO: I want to testify.

THE COURT: You do?

MR. SMEETON: Right now?

MR. SOWEWIMO: Yes.

THE COURT: Do you want to get up to the witness stand and tell me what you say happened—not what you think, but what you say happened or do you want to rest on the testimony as it is and not testify?

MR. SOWEWIMO: I want—

THE COURT: Sir, being charged with a crime, first of all, you are presumed to be innocent. The State proceeds first and they present their evidence. The State has proceeded. They have presented their evidence. They have rested their case. Now, you as a defendant do not have to present any testimony or any evidence whatsoever. You can rely on the presumption of innocence that I spoke about before without presenting any evidence if you wish to do that. But you also have an absolute right as a person accused of a crime to tell or to present evidence to tell what you say happened. Do you understand that?

MR. SOWEWIMO: Yes.

THE COURT: Do you wish to testify or do you not wish to testify?

MR. SOWEWIMO: I have evidence to present of which I talked to my lawyer about it before, and then he was supposed to get evidence—

THE COURT: That's not the question I asked. Do you want to testify or don't want to testify?

MR. SOWEWIMO: I want to testify with my evidence.

MR. SMEETON: Judge, maybe if we can pass this again, I can see what he is talking about.

THE COURT: Okay. We can pass it for a few minutes.

(Recess taken.)

MR. SMEETON: Before bench again is Mr. Sowewimo Abiodun.

[*sic*] After the last discussion before the Court I talked to the defendant at length in the lockup. He indicated to me, after a discussion, about what he may or may not want to testify to. He does not wish to testify in his defense. He indicated, unlike what he said on the record previously, there is no evidence at the department or anywhere else that he wishes me to present on his behalf.

THE COURT: Is that correct, sir?

MR. SOWEWIMO: Yes.

MR. SMEETON: I was unable to identify what he was talking about.

THE COURT: Is that correct?

MR. SOWEWIMO: Yes.

THE COURT: You do not want to testify; is that right?

MR. SOWEWIMO: Yes, sir.

THE COURT: All right. Then we are ready to proceed.

MR. RIECK: Judge, I think that since there is no change, that arguments are concluded."

The trial court found the defendant guilty of two counts of aggravated criminal sexual assault, aggravated unlawful restraint, stalking, aggravated stalking, attempted first degree murder, and aggravated discharge of a weapon. The defendant was sentenced to a total of 65 years of imprisonment: the two counts of aggravated criminal sexual assault were both 45 years and ran concurrently, aggravated unlawful restraint was five years and ran concurrently, stalking was five years and ran concurrently, aggravated stalking was five years and ran consecutively, attempted first degree murder was 15 years and ran consecutively, and aggravated discharge of a weapon was 15 years and ran concurrently.

ANALYSIS

I

■ The defendant argues that his right to testify in his behalf was denied by pressure from the trial court and his lawyer. A defendant has an absolute right to testify under the United States Constitution based on the fourteenth amendment's right to due process, the sixth amendment's compulsory process clause, and as a necessary corollary to a defendant's fifth amendment guarantee against compelled testimony. *Rock v. Arkansas* (1987), 483 U.S. 44, 51-53, 97 L. Ed. 2d 37, 46-47, 107 S. Ct. 2704, 2708-10.

However, a trial court has discretion to warn a witness of possible incrimination when the need arises. (*People v. Morley* (1994), 255 Ill. App. 3d 589, 597, 627 N.E.2d 397; *People v. Blalock* (1993), 239 Ill. App. 3d 830, 836, 607 N.E.2d 645.) The court "must walk the

fine line between, on the one hand, fully advising the witness of the danger of self-incrimination and the right not to testify, and, on the other hand, threatening the witness to an extent which materially impairs the defendant's due process right to present witnesses in his defense." (*Morley*, 255 Ill. App. 3d at 597.) When determining whether a trial judge's admonitions are proper, the facts and consequences of each case must be considered. (*Morley*, 255 Ill. App. 3d at 600, *People v. King* (1993), 154 Ill. 2d 217, 224, 608 N.E.2d 877.) In *King*, the Illinois Supreme Court established a two-prong test for establishing that admonitions violated a defendant's right to present witnesses in his own behalf: (1) whether the admonitions actually caused the prospective witness not to testify, and (2) whether the admonitions were somehow improper. *King*, 154 Ill. 2d at 224; *People v. Mancilla* (1993), 250 Ill. App. 3d 353, 359, 620 N.E.2d 1163.

■ In the instant matter, even assuming *arguendo* that the trial court's admonitions caused the defendant to forego testifying, we hold that the trial court's remarks were in no way improper. There was a great deal of confusion as to the defendant's desire to testify in this matter. We believe that the trial court took a neutral role in admonishing the defendant. Admonishments have been found "improper" when they were unnecessarily strong, threatening, or factually mistaken (*King*, 154 Ill. 2d at 224), editorialized that a witness would be foolish (*Blalock*, 239 Ill. App. 3d at 836), were an intimidating prediction of precise consequences (*Morley*, 255 Ill. App. 3d at 600), or were used as instruments of intimidation (*Mancilla*, 250 Ill. App. 3d at 360). In the instant case, none of the trial court's comments were intimidating or threatening in any way. Instead, the admonishments were given in a proper manner, and the court did not depart from its neutral judicial role. (See *Morley*, 255 Ill. App. 3d at 600.) The statements of the trial court to defendant merely "allowed him the additional time to make an informed decision" (see *Blalock*, 239 Ill. App. 3d at 837), and thus the comments were not improper.

## II

■ The defendant argues, and the State agrees, that defendant's conviction for aggravated discharge of a firearm cannot stand because the attempted murder count was based on the same act by the defendant. (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838.) Thus, the greater offense, attempted murder, is affirmed, and the conviction for aggravated discharge of a firearm is vacated. *People v. Lego* (1987), 116 Ill. 2d 323, 344, 507 N.E.2d 800.

In addition, the same two threatening acts formed the basis of

defendant's convictions for both stalking and aggravated stalking. Because stalking is a lesser included offense of aggravated stalking, defendant's stalking conviction must also be vacated. *People v. Segara* (1988), 126 Ill. 2d 70, 77, 533 N.E.2d 802; *Lego*, 116 Ill. 2d at 344.

### III

■ The defendant argues that the stalking statutes are unconstitutional. However, the Illinois Supreme Court recently held that both statutes are constitutional. *People v. Bailey* (1995), 167 Ill. 2d 210.

### IV

Defendant claims that the evidence was insufficient to support his convictions beyond a reasonable doubt for attempted murder or aggravated stalking. On review, the trial court's judgment will not be set aside unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to the defendant's guilt. (*People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317.) In a bench trial, it is for the trial judge to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. (*Slim*, 127 Ill. 2d at 307.) Where the evidence is conflicting, this court will not substitute its judgment for that of the trial court. *People v. Felella* (1989), 131 Ill. 2d 525, 534, 546 N.E.2d 492.

■ In order to sustain a conviction for attempted murder, the State must prove that the defendant had the specific intent to kill. (*People v. Bailey* (1994), 265 Ill. App. 3d 262, 273, 638 N.E.2d 192; *People v. Mitchell* (1984), 105 Ill. 2d 1, 9, 473 N.E.2d 1270.) It is sufficient to show intent when a person discharges a weapon in the direction of another individual, either with malice or total disregard for human life. (*Bailey*, 265 Ill. App. 3d at 273; *People v. Mendez* (1991), 221 Ill. App. 3d 868, 876, 582 N.E.2d 1265.) In this case, the defendant threatened Armon and pointed his gun at Armon. After repeated warnings to Armon, defendant fired a shot which barely missed Armon. The defendant argues that he could not have possibly missed Armon if he intended to kill him. However, Armon testified that P.S. was jerking around as the defendant pointed his gun and that the shot would have hit him had he not moved at the last moment. Questions of fact which arise concerning whether or not intent has been shown are for the trial court to resolve. (*Bailey*, 265 Ill. App. 3d at 273.) We believe the evidence is sufficient to support a finding that the defendant fired at Armon with the intent to kill.

The defendant also argues that the fact that he fired only one

shot at Armon conclusively demonstrates he did not intend to kill Armon. However, Armon left the room very quickly, and the defendant clearly thought he had killed Armon. The fact that defendant fired only one shot is of insufficient probative value to overturn the finding made by the trier of fact in this matter.

■ The stalking statute in effect at the time of the offense reads as follows:

"(a) A person commits stalking when he or she transmits to another person a threat with the intent to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint, and in furtherance of the threat knowingly does any one or more of the following acts on at least 2 separate occasions:

(1) follows the person, other than within the residence of the defendant;

(2) places the person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant." (720 ILCS 5/12—7.3 (West 1992).)

Thus, the State must produce sufficient evidence of: (1) a threat with the requisite intent; and (2) two separate incidents of following or surveillance by the defendant in furtherance of the threat. (*Bailey*, 167 Ill. 2d at 246; *People v. Krawiec* (1994), 262 Ill. App. 3d 152, 159, 634 N.E.2d 1173.) Aggravated stalking is committed when in conjunction with stalking a person causes bodily harm or restrains or confines the victim. 720 ILCS 5/12—7.4 (West 1992).

■ In the instant case, the defendant claims that the State did not demonstrate an initial threat or any incidents of surveillance. However, the State showed a threat through P.S.'s testimony that defendant took a switchblade knife and went up to her throat saying, "What did you say? You would rather be what than be with me?" As to the statute's requirement for "surveillance by remaining outside," surveillance within a separate portion of a large structure satisfies this condition. (*People v. Holt* (1995), 271 Ill. App. 3d 1016, 1022, 649 N.E.2d 571.) The two visits by the defendant to Banner were sufficient to be two separate acts of surveillance at P.S.'s place of employment. On the first occasion, the defendant remained outside P.S.'s workplace until he was taken away by the police. The defendant's refusal to leave P.S.'s workplace until arrested produced sufficient intimidation for that act to come within the statute. (See *Krawiec*, 262 Ill. App. 3d at 160; *Holt*, 271 Ill. App. 3d at 1022-24.) During the defendant's second visit, he confined P.S. in Banner's lunchroom.

This confinement was enforced surveillance and also met the statute's condition as to an aggravating factor. The State provided sufficient facts to sustain the conviction for aggravated stalking.

## V

The defendant next argues that he was denied effective assistance of counsel. The defendant must show his counsel's performance was so deficient that he was denied "counsel" as defined under the sixth amendment of the United States Constitution, and he must also show the deficiencies so prejudiced the defendant that he was deprived of a fair trial. (*Strickland v. United States* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) There is a strong presumption that any action or inaction by counsel is the product of a sound trial strategy. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) Moreover, even assuming serious deficiencies, there must be a reasonable probability that the fact finder would have had a reasonable doubt respecting guilt. *People v. Kitchen* (1994), 159 Ill. 2d 1, 40, 636 N.E.2d 451; *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

■ In the instant matter, the defendant first argues that his counsel presented no law that he was not guilty of attempted murder. However, counsel strenuously argued for a directed finding on attempted murder because the defendant lacked the necessary intent. Counsel then reiterated this argument in his closing. We do not see any serious deficiencies in counsel's performance as to this count.

The defendant also argues that his counsel did not demonstrate that the facts of his case were insufficient to prove stalking. Our supreme court has stated, "A reviewing court 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " (*Kitchen*, 159 Ill. 2d at 41, quoting *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) In the instant matter, the evidence was overwhelming that defendant had performed stalking acts in furtherance of a previous threat, and thus no prejudice was suffered by the defendant through his counsel's actions. See *People v. Caballero* (1989), 126 Ill. 2d 248, 260-61, 533 N.E.2d 1089.

## VI

■ The defendant argues that the trial court denied his right to cross-examine and present crucial evidence when it limited his questioning of P.S.'s opinion of the defendant's rationality on the day of the crime. We first note that defendant did not object to this issue in a written post-trial motion. Thus, defendant has waived this mat-

ter for appeal. *People v. Hobley* (1994), 159 Ill. 2d 272, 309, 637 N.E.2d 992; *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.

The plain error rule may be invoked as an exception to the waiver rule to correct errors in criminal cases where the evidence is closely balanced or where the error was of such magnitude as to deny defendant a fair trial. (*People v. Williams* (1993), 264 Ill. App. 3d 278, 285, 636 N.E.2d 630.) A trial court's evidentiary ruling will not be disturbed absent a clear abuse of discretion. (*People v. Flores* (1995), 269 Ill. App. 3d 196, 645 N.E.2d 1050; *People v. Enis* (1990), 139 Ill. 2d 264, 281, 564 N.E.2d 1155.) An analysis of the alleged error reveals that the defendant was allowed to delve fully into the relevant matters of defendant's sobriety and drug usage on the day of the incident.

## VII

■ Lastly, defendant argues that his sentences were illegal, excessive, and unconstitutional. The defendant first argues that imposition of an extended-term sentence for the aggravated criminal sexual assault counts could be made on a judge's "whim" and is therefore unconstitutional. Defendant has cited no authority to support this argument and has therefore waived it under Supreme Court Rule 341(e)(7) (145 Ill. 2d R. 341(e)(7)), which provides that the appellant's brief shall contain the contentions of the appellant and the reasons thereof, with citations of authorities. (*Pyskaty v. Oyama* (1994), 266 Ill. App. 3d 801, 822, 641 N.E.2d 552; *Blomquist v. Kent* (1994), 264 Ill. App. 3d 331, 335, 636 N.E.2d 850.) Moreover, defendant's contention was specifically rejected in *People v. Clark*, in which this court stated, "It is apparent to us that the criteria of the instant statute are not so ill-defined as to depend upon the opinion or whim of the trier of fact for its meaning." *People v. Clark* (1981), 102 Ill. App. 3d 414, 424, 429 N.E.2d 1255.

Defendant next argues that his sentences are excessive. However, absent an abuse of judicial discretion, the sentence imposed by the trial court will not be altered upon review. (*People v. Gonzalez* (1992), 151 Ill. 2d 79, 89, 600 N.E.2d 1189.) When a reviewing court examines the propriety of a sentence imposed by a trial court, it should proceed with great caution and care and must not substitute its judgment for that of the sentencing court merely because it would have weighed the factors differently. (*People v. Streit* (1991), 142 Ill. 2d 13, 19, 566 N.E.2d 1351.) This is especially true after a bench trial. Because the judge presided over the trial, he heard and reviewed the evidence for and against a finding of guilt and was in the best position to determine the appropriate sentence. *Felella*, 131 Ill. 2d at 541.

Defendant also alleges that his consecutive sentences were ille-

gal. However, the statutory sentencing provision requires consecutive sentences to be imposed in cases of criminal sexual assault occurring in a single course of conduct with another crime. 730 ILCS 5/5—8—4 (West 1992).

For the foregoing reasons, the judgment of the trial court is vacated as to the convictions for stalking and aggravated discharge of a firearm, and otherwise is affirmed.

Affirmed in part; vacated in part and remanded.

GORDON and McNULTY, JJ., concur.