SIXTH DIVISION
November 2, 2007

No. 1-05-2995

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04 C6 60827 |
| JAMES PEDEN, | ) ) | Honorable Christopher J. Donnelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Following a jury trial, defendant James Peden was convicted of residential burglary and sentenced to 10 years' imprisonment. On appeal, defendant contends that (1) the trial court violated his sixth amendment right to counsel by interfering with his attorney-client relationship during trial, and (2) the State violated his fifth amendment right not to testify during closing arguments. In addition, defendant challenges his 10-year prison sentence and the constitutionality of section 40-5(7) of the Alcoholism and Other Drug Abuse and Dependency Act (20 ILCS 301/40-5(7) (West 2004)), which pertains to eligibility for participation in Treatment Alternatives for Criminal Justice Clients (TASC). For the following reasons, we reverse and remand for a new trial.

### BACKGROUND

Defendant was indicted on a single count of residential burglary, which alleged that on April 20, 2004, he knowingly and

without authority entered the residence of Nancy Peden with the intent to commit a theft therein.

The undisputed evidence at defendant's jury trial established that the victim, Nancy Peden, was married to David Peden, who was defendant's brother. On April 17, 2004, David died after being involved in a motorcycle accident. Between April 17 and April 28, 2004, Nancy did not stay at the home she shared with David in Blue Island. Nancy gave Carol Peden (defendant's mother) keys to her home so that Carol could enter her home and provide care for Nancy's cats. In the evening on April 28, 2004, Nancy returned to her home and encountered defendant inside. Nancy asked defendant for her keys and told defendant to leave. Shortly thereafter, Nancy discovered that some coins that belonged to her son and a gold antique ring were missing. Ultimately, defendant confessed to police officers that he took the coins and Nancy's ring and sold the ring at a pawn shop.

The primary issue at defendant's trial was whether defendant entered Nancy's home with the intent to commit a theft. In relevant part, during opening statements, defense counsel argued that although defendant took items from Nancy's home he was not guilty of residential burglary because he did not enter Nancy's residence intending to steal. Instead, according to defense counsel, defendant initially entered Nancy's residence to feed her cats, but became overcome with grief after thinking about his

deceased brother David, which led him to take the coins and ring to sell for money to buy alcohol "in a pitiful attempt to drown his sorrow." Defense counsel emphasized that defendant initially went to Nancy's house with the intention of feeding her cats, not the intent to steal; therefore, he did not commit residential burglary.

In relevant part, immediately following defense counsel's opening statements, the following colloquy occurred outside the presence of the jury, as follows:

> "THE COURT: [Defendant], you just heard your lawyer give an opening statement, is that right?
>
> DEFENDANT: Yes, sir.
>
> THE COURT: Have you discussed with your attorney what she was going to say in her opening statement?
>
> DEFENDANT: Not completely, no. I mean not - I didn't know everything that she was going to say, no.
>
> THE COURT: Well, I understand you wouldn't know everything *** but did you understand that she said some things during her opening statement which could be viewed as admissions in which, for example, she seemed to indicate that you did, in fact,

3

1-05-2995

take a diamond ring and some money from this [residence] and that seemed to be without the permission of the person who owned these things and that could certainly be construed as a theft. And, so, that could be construed as an admission on your part. Did you discuss this particular trial strategy with your attorney?

DEFENDANT: Yes.

THE COURT: And you had given your permission to your attorney that this was part of a trial strategy and you were in agreement with this trial strategy, is that correct, sir?

DEFENDANT: Yes, sir.

THE COURT: Okay. Thank you."

The State's first witness was Nancy, who testified that after her husband David died on April 17, 2004, she stayed at her mother's home. During that time, Nancy permitted her mother-in-law, Carol Peden, to access her home to take care of Nancy's two cats. Nancy provided Carol with keys to her home, but Nancy did not give anyone else permission to enter her home.

At approximately 8:50 p.m. on April 28, 2004, Nancy returned to her home and found defendant inside. Nancy asked defendant to return her keys and leave her property and defendant complied.

4

After defendant left, Nancy discovered that a gold ring and some coins were missing from her home.

According to Nancy, defendant was not welcome inside her home during her entire two-year marriage to defendant's brother David and was never permitted to enter her home. Nancy testified that she never gave defendant permission or authority to enter her home after David died. On cross-examination, Nancy clarified that defendant would periodically attend dinner at her home, but he was always accompanied by Carol (defendant's mother). Nancy further testified that defendant would sometimes arrive alone and uninvited at her home and "to save family face" defendant would be allowed inside.

Blue Island police detective Christopher Connors testified that on June 2, 2004, he interviewed defendant at the Blue Island police department. After Detective Connors read defendant his Miranda rights, defendant agreed to give an oral statement, which Detective Connors memorialized. In that statement, defendant stated that on April 20, 2004, he was in the process of making arrangements for David's funeral when he found Nancy's keys, which had been given to his mother (Carol). After leaving the funeral home, defendant went to Nancy's house "to see what [he] could get." Defendant took an engagement ring and some coins and later sold that ring at a Cash America pawnshop for $300.

Schechinatzin Moreno testified that she was an assistant manager at Cash America Pawn. Moreno identified in a court a

loan ticket dated April 20, 2004, that reflected a transaction where a gold ring was exchanged for $300. The loan ticket included, *inter alia,* defendant's signature, address, date of birth, and social security number.

The defense called Carol Peden, who testified that she was defendant's mother. According to Carol, she visited Nancy and David's home on multiple occasions during their marriage. Carol further testified that defendant often was present during those visits and he was never asked to leave Nancy's home.

Following David's death, Carol agreed to take care of Nancy's cats. Carol explained that she and defendant went to the home where Nancy was staying, and defendant retrieved the keys from Nancy. Subsequently, Carol made numerous visits to Nancy's house to feed Nancy's cats and pick up the mail. Carol testified that defendant often accompanied her when she went to Nancy's home to care for her cats. Carol explained that she was never told that defendant was not permitted inside Nancy's residence.

After Carol finished testifying, the trial court dismissed the jury for a brief recess. During this time, two colloquies occurred that are relevant to the issues presented on appeal and are therefore recounted in detail. First, shortly after the jury was dismissed for a recess, the following colloquy occurred:

> "THE COURT: [Defense] [c]ounsel, how do you wish to proceed?
>
> MR. HENRY [Defense Counsel]: Judge, we

6

are going to call our final witness, [defendant].

THE COURT: I am sorry, you said you are going to call [defendant]?

MR. HENRY: Yes, we are.

THE COURT: [Defendant].

DEFENDANT: Yes, sir.

THE COURT: You need to understand that you have both the right to testify and the right not to testify and that is your right. You have heard me admonish this jury about how you don't need to prove anything and things along those lines. You heard me say those things?

DEFENDANT: Yes.

THE COURT: Okay. And, therefore, you have a right to testify and a right not to testify. Your attorney has discussed that with you. You have a right to [*sic*] both to testify and not tetsify [*sic*], correct?

DEFENDANT: Yes, sir.

THE COURT: You also heard me tell the jury that even if you did not, that they could not hold that against you. You heard that, didn't you?

DEFENDANT: Yes, sir.

THE COURT: Now, lastly, I want to tell you that this right, as I indicated, is your right, it is not your attorney's right. Obviously, you can consult with them, which I know you have, as to whether you are going to testify or not testify, but ultimately the decision is yours. You understand that, sir?

DEFENDANT: Yes, sir.

THE COURT: Have you made the decision about whether you wish to testify or not testify?

DEFENDANT: Yes, sir.

THE COURT: What is your decision?

DEFENDANT: I will testify.

THE COURT: Very well. Okay, [c]ounsel, are you ready to proceed now?"

Immediately following defendant's oral confirmation of his desire to testify and the State informing the court that the State was ready to proceed, the trial court questioned defense counsel in defendant's presence during a second colloquy, as follows:

"THE COURT: Now, taking a step further in line with what [defendant] and Ms. Harvey said during opening statement, are you anticipating your client making an admission?

8

Actually, I am speaking to your attorney.

MR. HENRY [Defense counsel]: Yes.

THE COURT: You are anticipating your client making an admission, potentially, to the charge of theft?

MR. MALONEY [Assistant State's Attorney]: Judge, may I say something regarding this issue?

THE COURT: No, not at this point in time. Thank you.

MR. HENRY: Yes.

THE COURT: Okay. Have you talked to your client about the ramifications of admitting to a crime on the witness stand?

MR. HENRY: I didn't talk to him about what could happen further on down the line. Give me a second.

(BRIEF PAUSE.)

MR. HENRY: Judge, after further reviewing, he will not be testifying.

THE COURT: All right. [Defendant], now we need to have the same kind of conversation. Now you have had further discussions with your attorney, is that right?

DEFENDANT: Yes, Judge, that is correct.

THE COURT: And is it your desire to testify, or not testify?

DEFENDANT: No, I will not be testifying.

THE COURT: [Defendant] is it because of what I said or is it because of the discussions that you had with your attorney?

DEFENDANT: It was on my own decision, but it was based upon the discussion I had with my attorney.

THE COURT: So, it was not based upon what I said. I didn't influence you one way or the other?

DEFENDANT: No, sir.

THE COURT: Okay. All right. Now we can bring the jury out.

After these two colloquies, the parties selected jury instructions and the jury was then called back into the courtroom for closing arguments.

During closing arguments, the State argued that defendant used his brother's death as an opportunity to "capitalize on his grieving sister-in-law." The State further argued that although defendant knew he was not permitted in Nancy's home, he took the keys that Carol had for Nancy's home and went to Nancy's home in order to steal from her. The State cited defendant's statement

10

to police officers as evidence that he intended to steal from Nancy and that "he was not there to tend to cats, he was there to steal, and that is what he did."

In rebuttal, defense counsel argued that defendant initially went to Nancy's home to feed her cats and only later decided to take the items from her home. Defense counsel further argued that defendant had permission to enter Nancy's home and that the whole incident amounted to "a breakdown of a family relationship." Defense counsel noted that defendant's statement to police officers was written by a police officer, and not by defendant. Defense counsel repeatedly asserted that defendant went to Nancy's home only with the intention to feed her cats, and the State failed to prove otherwise.

In surrebuttal, the State made the following comments, which are relevant on appeal and recounted in full, as follows:

> "You heard the defendant pawned those rings to get money to help his grieving. You heard that from the defense attorney. Was there any evidence of that at any point in the trial? No. Zero. All you heard is from his statement where he said I went there to see what I could get. You are told that just to create sympathy, as if he is upset that his brother has passed away, that you should feel for him today because he had a rough

11

time. Well, there was no evidence of that.
You just heard that from the defense
attorney, no one else."

The State reasserted that defendant was not grieving, but that he went to Nancy's home with the intention to steal and took advantage of her personal situation.

Following closing arguments, the jury found defendant guilty of residential burglary.

At the sentencing hearing, in relevant part, defense counsel referenced an earlier colloquy where the trial court indicated that it would consider imposing a lesser sentence if defendant would assist in returning the ring to Nancy. In response, the trial court commented, as follows:

"Well, I will be glad to do this. I'm
going to proceed with sentencing today. If
that ring does in fact turn up, then I will
be glad - and [defendant] had something to do
with it, to somehow get that ring back into
[Nancy's] hands - I will be glad to
reconsider his sentence. If [defendant] had
something to do with it."

At the close of the sentencing hearing, the court sentenced defendant to 10 years' imprisonment.

This appeal followed.

ANALYSIS

12

On appeal, defendant first contends that the trial court violated his sixth amendment right to counsel by interfering with his attorney-client relationship during trial. Specifically, defendant asserts that "the trial judge interfered with [his] attorney-client relationship in violation of the Sixth Amendment by questioning [him] and his attorney during trial as to strategic choices they had made which ultimately induced [defendant] not to testify."

The State replies that defendant has waived this issue by failing to object at his trial and not including this issue in his motion for a new trial. Alternatively, the State contends that the trial court's admonitions were proper and nonthreatening, and did not cause defendant not to testify. According to the State, the contested comments were made in an attempt to ensure that defendant understood the consequences of his admission, his right against self-incrimination, his right to testify, and his right to a presumption of innocence. In addition, the State contends that defendant has failed to prove that his testimony would have changed the outcome of the trial.

Initially, while defendant has waived this issue by failing to object at trial and raise it in a posttrial motion, we note that "a less rigid standard of waiver applies when the issue involves potential misconduct by a trial judge." People v. Vaughn, 354 Ill. App. 3d 917, 924 (2004). Moreover, waiver is a limitation on the parties, but does not limit this court's

1-05-2995

ability to consider the issue. <u>People v. Meadows</u>, 371 Ill. App. 3d 259, 261 (2007). Here, we choose to address the merits of defendant's claim because it involves alleged misconduct by the trial court.

The sixth amendment right to assistance of counsel exists in order to protect a defendant's fundamental right to a fair trial and, consequently, it is not recognized for its own sake, but rather for its effect on the ability of the accused to receive a fair trial. <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368-69, 122 L. Ed. 2d 180, 188-89, 113 S. Ct. 838, 842 (1993).

Our supreme court has determined that a trial court is neither required to admonish a defendant regarding his constitutional right to testify nor to set of record defendant's decision on that matter. <u>People v. Smith</u>, 176 Ill. 2d 217, 234-35 (1997). The <u>Smith</u> court explained that its conclusion was based, *inter alia*, on concerns that a court issuing such admonishments "'might improperly intrude on the attorney-client relation, protected by the Sixth Amendment,'" or potentially "interfere with defense strategy.'" <u>Smith</u>, 176 Ill. 2d at 235, quoting <u>United States v. Martinez</u>, 883 F.2d 750, 760 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991). Thus, it is typically defense counsel's responsibility to advise a defendant about his right to testify and discuss potential advantages and disadvantages of exercising that right. <u>Vaughn</u>, 354 Ill. App. 3d at 925.

14

In accordance with the concerns articulated in <u>Smith</u>, our supreme court has recognized that when a trial court chooses to admonish a defendant on issues that implicate trial strategy, the court "runs the risk of improperly intruding on the attorney-client relation and interfering with the defense strategy counsel has pursued, a strategy perhaps long in the making, but quickly undone by generalized admonishments." <u>People v. Medina</u>, 221 Ill. 2d 394, 409 (2006).

Nevertheless, a trial court has discretion to admonish a defendant of his right against self-incrimination. <u>Vaughn</u>, 354 Ill. App. 3d at 925. Where a trial court exercises its discretion in that regard, it must be careful to issue admonishments regarding self-incrimination and the right not to testify without impairing the defendant's ability to present his defense. <u>Vaughn</u>, 354 Ill. App. 3d at 925.

Ultimately, a reviewing court will find that a trial court has deprived a defendant of his right to a fair trial where the trial judge's improper admonitions influence the defendant not to testify, and thereby prejudice the outcome of his case. <u>Vaughn</u>, 354 Ill. App. 3d at 925, citing <u>People v. King</u>, 154 Ill. 2d 217, 224 (1993). Nonetheless, even where such admonitions cause the defendant not to testify, there is no deprivation of his right to a fair trial unless it affects the outcome of his trial. <u>Vaughn</u>, 354 Ill. App. 3d at 925.

Here, the record contains numerous instances where the trial

court queried or admonished defendant or his counsel about issues of defense strategy or regarding defendant's intention to testify. First, immediately following opening statements, the trial court engaged in a rather lengthy discussion with defendant regarding the defense theory announced during opening statements and asked defendant whether he had acquiesced in that theory. Defendant unequivocally informed the trial court that he was aware of his counsel's defense strategy and that he agreed with that strategy.

Next, after the defense had finished questioning its first witness (Carol Peden), defense counsel informed the trial court that defendant would be testifying. Immediately thereafter, the court admonished defendant of his right to testify or to decline to do so in detail. After this colloquy, defendant unequivocally informed the trial court that he wanted to testify.

Finally, and most significantly, even though the trial court had been explicitly informed by defendant both that he acquiesced with his defense counsel's strategy and wanted to exercise his right to testify, the trial court nevertheless proceeded to again discuss defense strategy with defendant's counsel in defendant's presence. During this incident, the trial court inquired with defense counsel whether he had talked to defendant about "the ramifications" of making a potential admission to the charge of

theft on the witness stand.[1]  As a result of the trial court's questioning, defense counsel chose to have a brief discussion with defendant and immediately thereafter informed the trial court that defendant did not wish to testify.  The trial court then asked defendant whether the court's statements had influenced his decision to not testify.  Defendant told the court that he had made that decision on his own and "based upon the discussion I had with my attorney."

Even though the trial court solicited a statement from defendant that the court's admonishments had not influenced his decision and he chose not to testify after consulting with his counsel, the record strongly suggests that defendant would have testified had the trial court refrained from repeatedly discussing with him and his counsel matters involving the defense theory and defendant's decision to testify.  Notably, defendant originally informed the trial court that he agreed with his counsel's strategy and wanted to testify, but later changed his mind after the court chose to revisit the issue by asking defendant counsel, in defendant's presence, whether counsel had discussed with defendant "the ramifications" of defendant's potential testimony.

Here, as illustrated by the parties' respective opening and closing arguments, defendant's intention at the time he entered

---

[1]As an aside, we note that defendant had not been charged with theft, but rather was solely charged with residential burglary.

Nancy's home was a crucial issue at trial. In fact, defendant's testimony was pivotal to his theory of defense, namely, that he did not intend to commit theft when he entered his sister-in-law Nancy's home and the trial court knew about this theory from opening arguments forward. However, because defendant did not testify, as he originally intended to do, there was no testimonial evidence produced at trial supporting this key defense theory. Simply put, in all likelihood, the trial court's admonishments seriously compromised defendant's ability to present his defense by causing defendant not to testify.

Our decision in Vaughn presents a similar situation. In Vaughn, this court found that the trial court committed reversible error when the court stopped the defendant during his testimony, admonished the defendant of his constitutional rights to counsel and against self-incrimination, and indicated to the defendant that the defendant's testimony essentially amounted to a confession of criminal guilt. Vaughn, 354 Ill. App. 3d at 920-22. As a result, the defendant chose to stop testifying and his previous testimony was stricken. Vaughn, 354 Ill. App. 3d at 922. While it might be fair to characterize the court's conduct in Vaughn as more extreme because the court in that case interrupted defendant's testimony, the basic principle remains the same: generalized admonishments by a trial court that implicate strategic choices reserved for a defendant carry the risk of improperly intruding on and interfering with the

18

attorney-client relationship.  See <u>Medina</u>, 221 Ill. 2d at 409.

Accordingly, after reviewing this record in light of the concerns articulated by our supreme court in <u>Smith</u> and <u>Medina</u> and this court in <u>Vaughn</u>, we find that the trial court's excessive and repetitive admonishments regarding issues of defense strategy and defendant's right to testify were improper.  We further find, contrary to the State's assertions otherwise, that the trial court's admonishments caused defendant not to testify and very likely affected the outcome of his trial, thereby denying him a fair trial.  Consequently, we reverse defendant's conviction and remand for a new trial.  See <u>Vaughn</u>, 354 Ill. App. 3d at 927 (reversing and remanding for a new trial where trial court issued inappropriate admonishments).

The State's reliance on our supreme court's decision in <u>People v. Hattery</u>, 109 Ill. 2d 449 (1985), is misplaced because <u>Hattery</u> is readily distinguishable from the case *sub judice*.  In <u>Hattery</u>, defense counsel conceded at trial that the defendant was guilty of murder, but argued that defendant was not eligible for the death penalty.  <u>Hattery</u>, 109 Ill. 2d at 464.  Ultimately, our supreme court determined that the defendant had been denied his sixth amendment right to effective assistance of counsel because the record did not establish that the defendant knowingly and intelligently consented to his counsel's strategy.  <u>Hattery</u>, 109 Ill. 2d at 465.

Here, in stark contrast to <u>Hattery</u>, defense counsel

19

consistently argued that defendant was <u>innocent</u> of the offense of residential burglary, which was the only offense that he was charged with, and never conceded defendant's guilt to residential burglary. Furthermore, also dissimilar to <u>Hattery</u>, is the fact that the record in the case *sub judice* indisputably establishes that defendant was aware of his counsel's defense strategy and agreed to pursue that strategy.

The State's citation to our decision in <u>People v. Sowewimo</u>, 276 Ill. App. 3d 330 (1995), does not alter our conclusion. Significantly, unlike this case, in <u>Sowewimo</u> "[t]here was a great deal of confusion as to the defendant's desire to testify." <u>Sowewimo</u>, 276 Ill. App. 3d at 339. Here, the record is quite clear that defendant was initially unambiguous in his desire to testify.

We recognize that the trial court had discretion to admonish defendant regarding his right to avoid self-incrimination. However, in this case, we emphasize that the court did not simply admonish defendant of that right, but instead also repeatedly and extensively discussed issues directly related to defense strategy with both defendant and his counsel.

Moreover, even though the trial court's admonishments were well intended, "the determination of whether the defendant will testify is an important part of trial strategy best left to the defendant and counsel without the intrusion of the trial court, as that intrusion may have the unintended effect of swaying the

20

defendant one way or the other." <u>United States v. Pennycooke</u>, 65 F.3d 9, 11 (3d Cir. 1995). Here, we reiterate that the record reasonably supports a conclusion that defendant would have testified in furtherance of the strategy advanced by his counsel during opening arguments had the trial court not repeatedly questioned defendant and counsel on matters related to that strategy.

Because we reverse defendant's conviction and remand for a new trial, we do not need to address the remaining issues that defendant raises on appeal.

CONCLUSION

For the foregoing reasons, we reverse defendant's conviction and remand for a new trial.

Reversed and remanded.

McBRIDE, P.J., and McNULTY, J., concur.